**DOW CHEMICAL COMPANY, TEXAS
DIVISION, Petitioner
Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.**

**Nos. 80–1764, 80–1765.**

United States Court of Appeals,
Fifth Circuit.*
Unit A

Nov. 5, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

were salaried and received a standard set of benefits.

Baker & Botts, Richard R. Brann, Joseph R. Weeks, Houston, Tex.; for intervenors.

Tom Martin Davis, Jr., Houston, Tex., for Certain Employees of Dow Chemical Co.

Elliott Moore, Deputy Assoc. Gen. Counsel, Allison Brown, NLRB, Washington, D.C., for respondent cross-petitioner.

Before MARKEY,** Chief Judge, and GEE and POLITZ, Circuit Judges.

MARKEY, Chief Judge:

Dow Chemical Company, Texas Division (DOW) and certain employee-intervenors petition to review and set aside, and the National Labor Relations Board (board) cross-petitions to enforce, two orders of the board issued July 18, 1980. The orders originated in two cases—one involving Dow and Local Union 716 of the International Brotherhood of Electrical Workers, AFL–CIO–CLC (IBEW), the other involving Dow and Local No. 1848 of the International Brotherhood of Painters and Allied Trades, AFL–CIO (IBPAT). The board found Dow guilty in both cases of violating 29 U.S.C. § 158(a)(5) [8(a)(5)] and 29 U.S.C. § 158(a)(1) [8(a)(1)] of the National Labor Relations Act (Act). The petitions have been consolidated on this appeal. We deny enforcement.

## Background

Dow operates a large chemical manufacturing complex in Brazoria County, Texas, with 7200 employees, of which 2700 were represented by unions and 4500 were not. Represented employees were paid hourly and received benefits bargained for by their respective unions; unrepresented employees

### A. IBEW

Since 1944, Dow had collectively bargained with IBEW. The most recent collective bargaining agreement covered May 1975—May 1978. On or about March 14, 1978 [1] certain members of IBEW filed a decertification petition. The board scheduled an election for April 14.

Between March 14—April 14, Dow conducted voluntary meetings at which management representatives informed IBEW members of the scheduled election, and answered their questions on differences between their existing wages and benefits and those of salaried, unrepresented employees. The managers presented slides illustrating the differences. In some respects salaries and benefits of unrepresented employees were superior to those of IBEW members. The managers repeatedly and specifically emphasized that they could not promise and were not promising that salaried pay and benefits would be available if the voters were to decertify the Union.

During the election campaign, Dow sent three letters, over the signature of D.A. Rikard, Vice-President of Operations, to the home addresses of IBEW members.

Enclosed in the first letter, dated April 3 and addressed to "Dow Electricians and Families," were reproductions of slides presented at the previous week's meetings. The enclosures compared life insurance, medical coverage, and various types of leave afforded unrepresented and represented employees. The letter stated that the "benefits covered [in the enclosures] . . . are specifically outlined in the policies and booklets issued by the Company to all salaried employees." In closing, Rikard wrote, "As we explained in the meetings, the law prohibits us from promising these salaried benefits to our Dow Electricians if they choose to decertify. This information is being provided for you solely in response

---

** Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. Events described in the text occurred in 1978 unless otherwise indicated.

to your questions to allow you to review the answers at your convenience."

The second letter, dated April 7, included reproductions of slides presented at the second set of meetings to illustrate pay and retirement policy differences. Rikard noted that although the retirement formula was "exactly the same for both hourly and salary" that "the higher the annual earnings, the higher the monthly retirement benefit." Rikard also commented on the availability of "excellent medical insurance for the families of salaried employees who die while employed at Dow." This letter closed with the same disclaimer paragraph pointing out Dow's legal disability against making any promises.

In the third letter, dated April 11, Rikard said it was "very significant" that employees from other groups who had voted to decertify had not chosen to revert to union status, illustrating that "these employees are being treated fairly and are well satisfied with their compensation and benefits." He concluded that "[a] 'no (X)' vote is a vote for a better way for yourself and your family."

Not surprisingly, there were numerous brief discussions about the election between supervisors and IBEW members during the campaign. Testimony regarding some of those discussions, and about some managers' statements at the meetings, figured prominently in the board's evaluation of Dow's pre-election conduct.

On April 14, the 115 IBEW members voted 63 to 52 against continued representation by the Union. On Monday, April 17, Dow placed the former IBEW members on salary and made available the fringe benefits es-

tablished for salaried employees. In changing the electricians' classification, Dow was following precedent established in 1969 and 1972, when employees affiliated with the Teamsters' and the Carpenters' unions voted to decertify and were placed on salaried status immediately after the elections.

On April 21, IBEW filed objections to the election, and requested that it be set aside, alleging that Dow had "destroyed the conditions necessary for the conduct of a fair election" by informing the electricians that "decertification of the Union would result in an immediate and substantial wage increase, along with other improved benefits," in violation of § 8(a)(1)[2] of the Act.

On May 18, some former IBEW members were granted increases of $140 to $150 per month, retroactive to the date of the election.[3] On May 22, the IBEW filed a charge with the board, alleging that Dow had "refused to bargain in good faith," and had "discriminated against its employees in terms and conditions of employment to discourage membership in a labor organization by granting increased wages and improved benefits."

On July 6, the board's Regional Director issued a complaint alleging that Dow had engaged in conduct violative of § 8(a)(1) and § 8(a)(5)[4] of the Act. The complaint and election objections were consolidated for hearing.

*Administrative Proceedings re IBEW*

The Administrative Law Judge (ALJ) who presided over a hearing on November 6–8 found that each of eight statements of Dow supervisors constituted a "promise of benefit" and thus an unlawful attempt to

---

2. Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1):

   "It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the Act]."

3. Upon transfer to salaried status, each former IBEW member received a $50 increase. That increase and the $140–150 increases resulted from the transfer to salaried status. The trans-

fer being determinative, no need was seen by the board, or is seen by us, for separate discussion of the increases.

4. Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5):

   "It shall be an unfair labor practice for an employer—
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

induce employees to vote against the Union in violation of § 8(a)(1). He considered three other statements or questions coercive inquiries violative of § 8(a)(1).

The ALJ stated, "If I were to view the informational meetings with employees (including the slide presentations on wages and benefits) and [the three letters] which were mailed to employees detailing the same material—in isolation, there would be a strong argument that the Company was correctly detailing the existing facts to employees in order that they could make an informed decision in the election.... [However,] [b]ecause of comments made by supervisors ... in which employees were told, *inter alia*, that they would receive better wages and fringe benefits, and would fare better as salaried employees, ... and in light of a systematic campaign of interrogation of employees, I find that the dissemination of benefits via slides and individual mailings to employees to be part and parcel of the Company's effort to woo the employees from the Union and in this context, constitutes a promise of benefits and is violative of Section 8(a)(1) of the Act."

Regarding the transfer to salaried status immediately after the election, the ALJ stated, "Since such actions were taken both before and after timely objections to the election were made, *the Employer made such changes at its peril.* As I have found [Dow's] conduct in the period prior to the decertification election is violative of Section 8(a)(1), and ... also constitutes objectionable conduct to the election, I find that the unilateral granting of the raises and change of employee status, done while the validity of the election was still in doubt, constitutes a violation of Section 8(a)(5) and (1) of the Act." [Emphasis added.]

Finding that "a fair election at this time would not be possible," the ALJ recommended that the election be set aside and that Dow be ordered to bargain with the Union "for a reasonable period of time." He further recommended that the bargaining order should not be construed to require a rescission of the benefits granted subsequent to the election.

The board affirmed the ALJ's rulings, findings and conclusions, and adopted his recommended order. The board added that if Dow had not engaged in pre-election unfair labor practices, it would nonetheless have still violated § 8(a)(5) and § 8(a)(1) by its post-election transfer to salaried status, citing *Presbyterian Hospital,* 241 NLRB 996 (1979).

## B. IBPAT

IBPAT had been the collective bargaining representative for Dow's painters since 1944. The most recent collective bargaining agreement covered May 19, 1975—May 18, 1978. On March 16, members of IBPAT filed a decertification petition. On August 25, the board scheduled an election for September 22.

During the month before the election, Dow conducted voluntary meetings with the painters as it had with the electricians. In response to painter's questions at the meetings, a Dow managerial representative compared the painters' current benefits to those available to salaried employees, using some of the slides presented at the earlier IBEW meetings. Disclaimers of making any promises were repeatedly made, as they had been at the IBEW meetings. On September 13 and 19, Dow's General Manager McClure sent letters to painters, one of which included, "I'm convinced that our people in the Texas Division don't need a union to assure them of good pay and benefits, as well as fair treatment. I hope you share this feeling and will cast a vote for yourself and your family by voting *NO* on election day."

The 44 eligible painters voted 29 to 15 to decertify. Following its customary practice, Dow transferred the painters to salaried status on the first working day after the election.

On September 28, IBPAT filed objections to the election, alleging that Dow had informed the painters that they would receive improved wages and benefits if they voted against the Union. On November 15, IB-

PAT filed a charge that Dow had refused to bargain. A complaint issued on December 1, charging that Dow violated § 8(a)(1) and § 8(a)(5) by offering its employees certain benefits prior to the election and by granting a post-election increase and salaried benefits without notice or consultation with the Union. The complaint and election objections were consolidated for hearing.

### Administrative Proceedings re IBPAT

The ALJ who conducted hearings on April 26 and 27, 1979, found that Dow had not promised benefits, saying, "[I]t had no need to do so, since the Company's practices were common knowledge. All the Company did was furnish specific details and comparisons so the voters were completely informed of what they would gain in material benefits by abandoning union representation, as surely the Union informed them of what they would gain by continued representation."

The ALJ recommended dismissal of the complaint in its entirety, concluding that because Dow had not interfered with its employees' free choice in the election, its post-election transfer to salaried status did not violate the Act. He recommended that IBPAT be officially decertified.

The board affirmed dismissal of the complaint with respect to Dow's pre-election conduct and decertified the union. It went on, however, to disagree with the ALJ's conclusion of law respecting Dow's post-election conduct, holding that, despite the validity of the election, Dow had violated § 8(a)(5) and § 8(a)(1) by unilaterally transferring the painters to salaried status before the results of the election were validated, again citing *Presbyterian Hospital, supra*.

5. In view of our disposition, it is unnecessary to discuss a third issue raised in the briefs, that is, whether the board's bargaining orders or rerun elections were the appropriate remedy.

6. Section 8(c) of the Act, 29 U.S.C. § 158(c): "The expressing of any views, argument, or opinion, or the dissemination thereof, wheth-

*Issues*[5]

(1) Were pre-election statements and questions of Dow supervisors to IBEW members violative of § 8(a)(1), or were those statements protected speech under § 8(c)[6] of the Act?

(2) Were post-election transfers of former IBEW and IBPAT members to salaried status, before validation of election results, a violation of § 8(a)(5) and § 8(a)(1) of the Act?

### OPINION

#### (1) *Dow's Pre-Election Statements.*

Under § 8(c) of the Act, an employer has the right to express "any views, argument, or opinion" so long as "such expression contains no threat of reprisal or force or promise of benefit." The board, in adopting the ALJ's determinations that eight statements of Dow's supervisors to IBEW members, made at the meetings and in separate conversations, were "promises of benefit," and three were "coercive inquiries," necessarily viewed all eleven pre-election statements as having overstepped the limits of § 8(c).

When the board's findings are reasonable and supported by substantial evidence, a court will affirm them, though the court might well have made contrary findings if sitting *de novo*. Reviewing courts are not, however, rubber stamps. Theirs is not only the right but the duty of overturning findings unreasonable and not supported by the evidence of record. "[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456

er in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

(1951). Applying those standards, we conclude that the board's eleven statement-based findings of separate § 8(a)(1) violations are unsupported by substantial evidence. Nothing of record supports IBEW's charge that Dow's pre-election conduct "destroyed the conditions necessary for the conduct of a fair election."

In reaching our conclusion, we deem it unnecessary to resolve any question of credibility or testimonial conflict. Though Dow strenuously argues that the statements allegedly made were not in fact made, we assume here that they were. The board cautions us with reminders of our inability to observe the demeanor of witnesses, and thus to judge credibility, an inability of which we are fully aware. The ALJ's reference to demeanor and credibility related, however, only to his finding that the eleven statements were made. We accept those findings, and review the statements in the light of the law.[7]

(A) *Promises of Benefit.*

In testing whether substantial evidence supports the board's findings that eight statements were promises, three facts in the record are of great probative force. First, it is undisputed that Dow's managers and supervisors repeatedly and specifically cautioned that they could not promise and were not promising anything if the election resulted in decertification. Second, as recognized by each ALJ in decisions adopted by the board, it was common knowledge at Dow, long before the decertification petitions were filed, that decertifying normally meant "going salaried." Third, no witness testified that *he* considered any of the eight statements to have constituted a promise. An absence of those three facts would not alone make the statements promises, for none was a promise *per se.* The presence of those facts, however, undermines the determination that the present statements can properly be interpreted as promises of benefit under the circumstances of record here.

In analyzing election campaign statements of employers for the presence of promises, no need exists for unearthing an express statement that particular benefits will be given in exchange for a vote to decertify. The Act is violated by statements from which promises may reasonably be inferred. *Chromalloy Mining and Minerals v. N.L.R.B.,* 620 F.2d 1120, 1124–25 (5th Cir. 1980). The inference, however, must be one reasonably makeable by the employee or employees to whom the statement is made. It is not sufficient that bits and pieces of statements may be later lifted out of context, that the facts and circumstances in which the statements were made and which were known to the employee or employees may be ignored, and that those bits and pieces may then be viewed in vacuo as either promises or non-promises. *See Federal-Mogul Corp. v. N.L.R.B.,* 566 F.2d 1245, 1254 (5th Cir. 1978); *cf. N.L.R.B. v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 381 (5th Cir. 1973).

Also central to an analysis of employer statements is the principle that § 8(c) at an irreducible minimum protects the right of an employer to state its views, argument, or opinion, and to make truthful statements of existing facts. The First Amendment would permit no less. *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). As the ALJ in the IBPAT proceeding stated: "Section 8(c) of the Act is completely devoid of meaning unless it permits an employer to clearly portray its practice with respect to its unrepresented employees so they could decide whether they wanted to secure unrepresented status." Indeed, the board has stated: "Section 8(c) grants to an employer the right, in a manner and setting free from coercion, to compare benefits presently in effect in his unorganized operation with those enjoyed by employees in a simi-

---

**7.** We do not, of course, consider testimony nowhere mentioned or referred to below, as a basis for a violation finding or otherwise, by the ALJ or the board. The board's brief quotes some of that testimony. Nor do we consider

Dow's inappropriate allegations of bias on the part of the ALJ. In his decision the ALJ paraphrased the statements at issue. We treat and quote the statements themselves.

lar operation which has union representation." *Walgreen Co.*, 203 NLRB 177 at 181 (1973). *Walgreen* was not mentioned by either ALJ or by the board.

The ALJ did not simply ignore the freedom of expression of views assured employers under the First Amendment and § 8(c). He said:

> Granted, there is often a fine line between the exercise of freedom of speech under Section 8(c) and violations of Section 8(a)(1) of the Act where statements and conduct involve threats or promise of benefit. With certain exceptions (e.g., medical benefits), I have found no explicit promises to raise wages a certain amount. However, numerous supervisors did more than supply information to employees, they systematically contacted electrician employees in the unit and, *inter alia*, urged them to decertify the Union stating that medical benefits were better, that they would be stupid not to decertify, that they would fare better on benefits as salaried employees, that the Company would pay them more but for the union, that the lowest paid carpenter (salaried-unrepresented) received more than the highest paid electrician, etc.

\* \* \* \* \* \*

> I am aware of and have not disregarded Respondent's principal contention that Section 8(c) (and its related First Amendment claim) grants Respondent freedom to express its views, and particularly here, where all Respondent had to do was point out existing wage and benefit scales for salaried employees. In this case, the anamoly [sic] exists that wages and benefits for salaried employees were in fact better in some respects than wages and benefits being paid hourly represented electricians. In essence it can be argued that by telling the facts the Respondent was automatically engaging in a promise of benefits. I have attempt-

ed to reconcile the right of employees to be informed and the right of the employer to express his views under Section 8(c) with existing law that prohibits an employer from making threats or promises of benefits in violation of Section 8(a)(1) or constituting objectionable conduct prior to an election. I have concluded that on the basis of the record as a whole, Respondent did more than inform the employees of benefits currently enjoyed by salaried employees. It systematically interrogated employees as to their views on the decertification election and made the judgment that their wages and benefits would be better and attempted to "sell" that judgment to employees and thereby induce them to reject their existing union representation. It can be argued, of course, that if the Respondent is entitled to inform the employees of existing wage and benefit scales for salaried employees, why is it not entitled to use such factual material in campaigning to reject the Union? I have found that employees and supervisors alike were aware that decertification meant that employees · would become salaried. In light of this, the Respondent went too far when it made the *judgment* that decertification meant better and increased wages and benefits *and told* the employees that. By so doing, the Respondent advanced into a forbidden area of promising employees benefits if they voted to reject the Union. [Emphasis in the original.] [8]

As appears *infra*, the foregoing falters for lack of support in the record.

The board says in its brief that "an employer is entitled to present facts concerning the benefits or experience of its non-union employees," but that an employer "is not free to inform employees outright or by suggestion, that it will give them *more* if they vote to decertify the union." [Empha-

---

8. The reference to Dow's having made a "judgment" is difficult to understand. If, as the ALJ recognized, everyone knew decertification meant "employees would become salaried," and if "wages and benefits for salaried employees were in fact better in some respects," it would seem that a judgment contrary to that attributed to Dow would be impossible. As appears in the text, what Dow actually told its employees did not constitute threats or promises.

sis the board's.] Nowhere in the statements at issue, or in the circumstance in which they were made, can there be found a suggestion that IBEW members would get "more" than then-salaried employees were getting if they voted to decertify. There was no promise that they would get even the same, though, as the ALJ recognized, it was common knowledge that "going salaried" normally followed decertification. The board's brief undercuts the notion that promises were made. In arguing for the appropriateness of a bargaining order, the board recognizes that though the electricians knew that salaried status had followed past decertifications "they had no way of knowing just how much greater their own weekly earnings would be . . . if they voted to decertify the IBEW," and "the extent of the Company's post-election changes was unknown to the employer prior to the election."

There is no allegation that any statement of fact by Dow's supervisors was untruthful. Three statements were truthful answers to employee questions. One was a clarification of an employee's misstatement at a meeting. Three were statements of opinion. One was an expression of the speaker's desire. For a full month, the forthcoming election was necessarily a topic of many conversations. If the eight statements here involved must under the present circumstances be considered "promises" violative of the Act, virtually nothing would be left to employers in an election campaign but a sterile silence.

Moreover, nothing of record indicates that the employee-craftsmen here involved, electrician-members of IBEW, were so illiterate or unsophisticated as to have been misled or influenced to vote against their will by subtle nuances in the challenged statements, by drawing the inferences drawn by the ALJ, or otherwise. It would neither surprise nor coerce an IBEW member, for example, to hear that a Dow supervisor believed in or desired decertification of the Union. We do not deal here with the recognized imbalance of power between an employer and an individual employee in a bargaining context. We deal with an election, where the effective silencing of one source of information would be a clear disservice to employees faced with the need of making an informed choice.

Lengthy court opinions are anathema, yet explication of the evidentiary void surrounding the statement-based findings requires discussion of all eleven statements.

(a) *Statements of Superintendent Goff.*

Union steward Long testified that an unidentified electrician at a pre-election group meeting, "asked why we couldn't get them [salaried] benefits before," and that "Mr. Goff, I think, replied that the company had to deal with a third party. And if they didn't have to deal with this third party, they wouldn't have to process grievances, have arbitration and negotiation. They wouldn't need Labor Relations; they'd have more money to spend on the Dow employees." Interpreting Goff's response as "a clear indication that without the Union, employees would get more money," the board viewed it as a promise of benefit.

A truthful statement, in answer to a question on why money was not being spent on employees, that more money would be *available* to spend on employees if it were not being spent on labor relations, is not the same as a *promise* that that money would be spent on higher wages and benefits for employees. Economics, to say nothing of common sense, dictate that without the costs of running a Labor Relations department, and of negotiating and administering collective bargaining agreements, Dow would have more money to spend elsewhere. Whether that money should be spent on labor relations was not involved in the statement. That choice was yet to be made by the employees at the election. The statement that more money would be available is thus one of existing fact. In view of Dow's repeated disclaimers concerning promises, the truthful statement that Dow would "*have* more money to spend on the Dow employees" must be viewed as incorporating Dow's unquestioned unilateral right to choose, after decertification, whether to

spend it on the employees or elsewhere. That the question dealt with salaried benefits known to be higher, that decertification had historically meant "going salaried," and that the question itself required reference to the union, are further circumstances undermining the board's interpretation of the statement as a promise. Accordingly, we find Goff's response protected under § 8(c).

Long further testified that Goff answered a question about "how much money they was [sic] talking about" by stating that "he couldn't tell us anything about the amount of money, but the lowest paid carpenter made more than the highest paid electrician." The board says this "direct comparison between the wages of the nonrepresented carpenters and the represented electricians indicated to employees the benefits of nonrepresentation," and thus constituted a promise of benefit.

The board did not elucidate the basis for its apparent belief that employers may *not* in an election campaign truthfully indicate to employees the benefits of nonrepresentation. Nor did it explain the basis for its conversion of that indication into a promise. Nor did it explicate the obvious conflict with its statement in *Walgreen Co., supra.* Nor did it say why it thought employees involved as the electorate in an election campaign should *not* be told "the benefits of nonrepresentation," along with, as the board would presumably approve, the benefits of representation.

■ Unchallenged testimony established the truth of the response that "the lowest paid carpenter made more than the highest paid electrician." Hence Goff's statement in response to an employee's question was no more than a truthful comparison of benefits available to represented and unrepresented employees, a comparison recognized as legitimate campaign conduct protected under § 8(c). *See Central Hardware Co. v. N.L.R.B.,* 439 F.2d 1321, 1329 (8th Cir. 1971), *vacated on other grounds,* 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); *J. S. Dillon & Sons Stores Co. v. N.L.R.B.,* 338 F.2d 395, 400 (10th Cir. 1964); *N.L.R.B. v. Laars Engineers, Inc.,* 332 F.2d 664, 667 (9th Cir.), *cert. denied,* 379 U.S. 930, 85 S.Ct. 325, 13 L.Ed.2d 342 (1964); and *Walgreen Co., supra.*

Moreover, Goff explained without contradiction that he told the employees that salaries were confidential, that he could not answer questions about salary directly, and that it was only the need to correct the implication that unrepresented carpenters were treated less favorably than electricians, and to set the record straight, that caused him to make the comparison. Goff's statement in context was not a promise to grant increases if employees voted to decertify.

Union steward Tomlin testified that Goff stated "that because we were represented by the Union, that Dow couldn't pay us sometime [sic] what they'd like to. And I asked him why. And Lee Wilkins answered and said it was because of the laws that they couldn't pay it." Electrician Salinas testified that Goff had "said something about that he would like to pay us more than what we were worth, but he couldn't pay it because we belonged to the I.B.E.W. And I think Mr. Tomlin asked him why. And then before Mr. Charlie Goff could answer, Lee Wilkins jumped up and told him that it was the law...." The board viewed Goff's statements as promises.

Lee Wilkins, Manager of Labor Relations, testified, without contradiction, that Tomlin, the questioner, had *first* said pay scales in the collective bargaining agreement were merely a minimum, not prohibiting Dow from paying more than the agreed rates. Consistent with the testimony of Tomlin and Salinas, Wilkins said he responded to Tomlin that, as he understood it, "any benefit offered any bargained for personnel with respect to increase of wages or benefits of any kind had to be offered to all. And [Dow] couldn't individually decide what a given electrician was worth."

■ Dow was foreclosed from paying individual employees without regard to the provisions of Article XXVIII of the labor contract governing wage adjustments within particular job classifications. The state-

ments of Goff and Wilkins concerning an inability to unilaterally vary wages among individuals beyond the agreed scale was thus not a promise but a truthful statement of existing fact protected under § 8(c).

Electrician Allen testified that at a meeting someone had asked, "what was going to happen to Mr. T. A. Hutchins," an apprentice who had failed the journeyman test a few weeks before the election. According to Allen, Goff answered, "[I]f Mr. Hutchins was [sic] salaried that the company would have more leeway as to what to do with it; but under the existing labor contract, that he was washed out." That response to a question, citing a labor contract provision, was given a new connotation when the board found that "Goff was pointing out that management would be more lenient with apprentices if they were unrepresented and thereby violated Section 8(a)(1)."

Article 30, § 7 of the collective bargaining agreement between Dow and IBEW provides that, "an apprentice who fails the [journeyman] exam will be released from the program." Allen admitted that Goff had essentially said that if there were no labor contract in the picture, individual treatment could be given in such cases. Goff did not promise that Hutchins, or any other apprentice who failed a journeyman test, would be retained in the future if the electricians voted to decertify. "Leeway" is not here synonymous with "leniency." In context, therefore, Goff's remark was at most a truthful identification of a possible disadvantage of being governed by a labor contract. It was a truthful response to a question, to which under the circumstances the only alternatives would be either an incomplete answer or a refusal to answer. As such, it constituted an accurate observation of fact within the bounds of legitimate electioneering protected under § 8(c).

(b) *Statements of Foreman Williamson.*

Electrician Allen testified that one day during the decertification campaign, he and Williamson "were just talking about general things; you know, talking a lot about it.

was such a pretty day, and I commented I'd sure like to go fishing. And he said, well, if we were to decertify, then I possibly could, you know." Allen also stated, however, that he had realized that half-days off were a salaried benefit. The board says Williamson's comment was "a holding out of a possible benefit."

Allen's testimony describes a conversation about "general things," "a pretty day," and his expressed desire to "go fishing." Williamson's response thus occurred in a casual conversation, the very type of "setting free from coercion" referred to by the board in *Walgreen Co., supra* at 181. Allen knew that one benefit available to unrepresented employees, but not negotiated for IBEW members, was the right to take half-day vacations. Williamson's remark referring to that known and factual *possibility*, in response to Allen's expression of a desire to go fishing on a pretty day, was not a promise of benefit but a statement protected under § 8(c).

(c) *Statements of Foreman McGee.*

Electrician Johnson testified that on the day before or the morning of the election, McGee came to his shop area and said "that he thought the electricians would be better off salaried, and that he figured that a guy would be dumb or stupid not to vote to decertify or to go salaried." Electrician LeBoeuf testified that McGee on the day before the election, told him that "he wished that we would decertify; that it would be to my—for my future and security that we do so." The board found these statements promises violative of § 8(a)(1).

There being no evidence that either Johnson or LeBoeuf viewed McGee's comments about what he "thought" and "figured" and "wished" as either coercive or promissory, those comments can only be considered the type of generalized statements of opinion permissible on both sides in an election campaign. The record is devoid of substantial evidence to support a finding of a § 8(a)(1) violation in McGee's statements of his opinion.

**(d)** *Statements of Foreman Oswald.*

Electrician Rab testified that during the campaign Oswald told him that "he wished we would decertify, because if we did . . . they could do a lot more for us. They could perhaps, take us out for supper, or something to that effect, and reward us for doing a real good job." The ALJ stated that though "taking them 'to supper' seems almost innocuous, it does nevertheless, continue a trend of promising employees 'rewards' if they decertified the Union." The board found Oswald's comment violative of § 8(a)(1).

Testimony of a witness must be reviewed and evaluated in its entirety. Here, for example, the ALJ and the board quoted only partially from Rab's testimony, disregarding that part in which Rab testified that Oswald *also* said, in the *same* conversation, that "he wasn't promising anything." There is no inconsistency between the two segments of Oswald's statement described by Rab, and no reason to choose one and exclude the other. Indeed, the ALJ found it unnecessary to consider whether disclaimers of promises were said "tongue in cheek" because "employees and supervisors acknowledged that if the union were decertified, the employees involved would become salaried based on past practice and the fact that the Company had only two classes of employees, hourly represented and salaried unrepresented."

▉ Testimony of a witness must also be evaluated in light of that of other witnesses which is consistent with the testimony under evaluation. Rab's testimony that Oswald denied any promise cannot be simply ignored, particularly in light of its total consistency with Oswald's unchallenged testimony that he had made it "very clear" to employees that he could not make any promises, and that in response to employee questions, he explained his views on how being treated individually could work to the employees' advantage. In the context of the freedom to state the truth and honest opinion in an election campaign, and in light of all consistent testimony, including the admitted disclaimer of any promises,

Oswald's remark was not a promise but a protected statement under § 8(c).

**(e)** *Statements of Foreman St. Clair.*

Union steward Long testified that St. Clair told him during the campaign that "he believed we would be better off going salaried." Long further testified that St. Clair later called him into his office and told him "we would be better off decertified, and we'd have better benefits and make more money." Electrician Henderson testified that St. Clair told him that "he thought that the electricians would be better off financially and in benefits by going salaried —decertifying." The board considered St. Clair's comments promises.

▉ Apart from the right of an employer in an election campaign to say it "believed" and "thought" employees would be "better off," the corollary of a union's right to say they would not be, the circumstances in which St. Clair's comments were made cannot be disregarded. Those circumstances cast a light quite different from that in which the board viewed those comments. Henderson admitted that he had known St. Clair for twenty-five years and considered him a friend. Their conversation occurred on a non-business related drive together on a Sunday afternoon. Long also knew St. Clair, who was not his supervisor, for a long time and had talked with him in his office several times before, "usually about fishing." St. Clair candidly testified that he told Long "friend to friend" that it was his "honest, personal opinion" that the electricians would be better off if the Union were decertified.

That neither Long nor Henderson testified that *they* interpreted St. Clair's statements of his thoughts and beliefs as promises of better benefits and wages in exchange for decertification, is consistent with St. Clair's unchallenged denial of ever promising anything to Long or Henderson.

▉ Nothing in the law prohibits an employer's representatives in an election campaign from stating, in a setting free from coercion, their opinion or belief that voters

would be better off if they voted to decertify, any more than it prohibits union representatives from stating a contrary opinion. That is what an election campaign is all about. The statements of St. Clair to personal friends in private conversations were noncoercive expressions of personal opinion protected under § 8(c).

### (B) *Coercive Questions.*

The ALJ labeled three occasions, when Dow supervisors asked certain employees about the election, "a systematic campaign of interrogation." The board says the three occasions involved coercive inquiries or unlawful interrogation in violation of § 8(a)(1). Quite apart from whether three instances of inquiry during a month-long campaign for the allegiance of 115 voters may be considered a "systematic" anything, the inquiries themselves cannot on this record be considered coercive. No witness testified that *he* considered any of the three questions coercive, and nothing in the circumstances of record warranted the ALJ, the board, or would warrant us, in doing so.

In *N.L.R.B. v. McGahey*, 233 F.2d 406 (5th Cir. 1956), this court described casual and moderate inquiries, even as to union preference, absent evidence indicating that the employee has reason to consider the inquiries a threat of reprisals, as not constituting an unfair labor practice in violation of § 8(a)(1). In *McGahey*, threats to close the plant and comparable menacing predictions were forecasts of reprisals. No such threats appear in the present record.

In *Federal Mogul Corp. v. N.L.R.B., supra*, this court supplied extensive guidance and precedent in setting forth what it designated the *Bourne* Rule. *Bourne v. N.L.R.B.*, 332 F.2d 47 (2d Cir. 1964); *see also N.L.R.B. v. Camco, Inc.*, 340 F.2d 803, 804 (5th Cir.), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). Under that rule, all of the circumstances must be considered in light of certain listed factors. This court there described the ALJ's election not to apply the *Bourne* Rule as improper.

In *Paceco v. N.L.R.B.*, 601 F.2d 180, 182–183 (5th Cir. 1979), this court said: "While it is correct as a general proposition that '[o]nly when the interrogation tends to restrain, coerce, or interfere with employees in the exercise of their rights under the Act is such interrogation proscribed by Section 8(a)(1),' *NLRB v. Sunnyland Packing Co.*, 5 Cir. 1966, 369 F.2d 787, 793 . . . [citations omitted], we find the mere recital of that general standard without more too cryptic to permit us to determine whether there is substantial evidence to support the board's conclusions." In *Paceco*, this court again detailed the factors [9] to be considered in determining whether a line of questioning has the effect of interfering with employees' rights under § 7 of the Act,[10] vacated the board's order, and remanded for reconsideration in light of those factors.

Here, the board's brief contains *ad hoc* assertions of counsel touching at most four of the eight factors listed in *Paceco*. Neither the ALJ nor the board articulated a relationship of *Paceco* factors to the challenged inquiries. In the interest of judicial economy, and in view of the nature and circumstances of the three inquiries involved, we decline what would be merely a *pro forma* remand to the board for applica-

---

**9.** History of employer's conduct toward employees; nature of information sought; position of questioner in company's hierarchy; place and method of interrogation; truthfulness; whether employer had a valid purpose for information on union strength; whether that purpose was communicated to employees interrogated; and whether company personnel gave employees any assurances that they would not be subject to reprisals. *Paceco v. N.L.R.B., supra* at 183.

**10.** Section 7 of the Act, 29 U.S.C. § 157:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

tion of *Paceco* factors. That action would serve only to further delay for the parties a final resolution of a dispute now more than three years old.

When the inquiries here involved are examined in light of over thirty-four years of Dow—IBEW collective bargaining, on this record hardly a history of hostility on either side, in light of all the evidence, in light of the factors listed in *Paceco,* and in light of this court's prior holdings, the inquiries are seen to be non-violative of § 8(a)(1).

### (a) *Question of Superintendant Goff.*

Salinas testified that Goff asked "what I thought about the decertification, and I told him that either way it would affect my family." The board found Goff's inquiry "coercive and violative of Section 8(a)(1)."

■ Goff asked Salinas a single question on what he thought about the election. That question did not concern Salinas' voting intention. Goff pressed no further after Salinas' noncommittal response. Goff is not even alleged to have asked Salinas how he intended to vote or for his attitude toward the Union. There is not the slightest evidence indicating that Salinas had reason to consider the question as forecasting a reprisal. We find nothing in the record to support the finding that Goff's question was coercive or that it constituted a § 8(a)(1) violation.

### (b) *Question of Foreman Hargrove.*

Electrician Hernandez testified that Hargrove asked him and another electrician (Gary) "how we was [sic] voting." Hernandez testified that he remained silent but that Gary answered "yes," meaning, says Hernandez, that Gary would be voting for the Union, and that Hargrove then "started talking about our benefits would be better...both as far as insurance goes and...we would have a better opportunity

going salaried." The board said Hargrove "engaged in unlawful interrogation and promises of benefits, both of which constitute separate violations of Section 8(a)(1)."

■ Hernandez was the only employee to claim that a supervisor had asked how any employee intended to vote.[11] Yet Hernandez *also* testified that Hargrove's question was posed "in a joking manner." Again, in analyzing a question to detect the presence of coercion, the context, manner, and circumstances in which the question occurred cannot simply be ignored. That neither Hernandez nor Gary said they felt coerced, and that the question was admittedly put and received in a humorous tone, indicate its noncoercive nature. The record lacks substantial evidence to support a finding that Hargrove's question constituted coercive or unlawful interrogation.

When asked whether Hargrove had ever made any promises to him of increased benefits, Hernandez answered "No." He acquiesced in a characterization of the conversation with Hargrove as essentially a discussion of benefits available under salaried status, that is, a comparison fully within the bounds of § 8(c). No support can be found in the record for the board's finding that Hargrove's statements constituted promises in violation of § 8(a)(1).

### (c) *Question of Manager Walker.*

Electrician Elliott testified that Walker "wanted to know what my feelings was [sic] about the voting and the election," that he answered that he would not be where he is today but for the Union, and that Walker said "if we went salaried, that it would be beneficial—could be beneficial to me, on account of my age and length of service." The board says that "by interrogating Elliott and indicating it would be beneficial to him if he voted to decertify, [Dow] engaged in conduct violative of Section 8(a)(1)."

---

**11.** Hargrove denied asking about intention, and testified that he only asked "their feelings on the election, and how did they think the election would go." Gary, described by Hernandez as the only one who answered, did not testify. His testimony might have been helpful in re-

solving the testimonial conflict. As indicated in the text, we do not attempt here to resolve the conflict, nor do we consider allegations of hearsay, but accept the truth of Hernandez' testimony. We do, however, evaluate Hernandez' testimony in its entirety.

▆ Elliott did not say Walker asked his voting intention, a fact consistent with Walker's uncontradicted testimony that he did not ask Elliott how he intended to vote. Elliott did not testify that he felt coerced and the question is not *in haec verba* coercive. Insubstantial evidence appears in the record to support a finding, even by inference, that Walker's question was anything other than the type of casual or moderate inquiry described as non-violative of § 8(a)(1) by this court in *McGahey, supra.*

Elliott did not testify that Walker made any promises, or that he viewed anything Walker said as a promise, a fact consistent with Walker's uncontradicted testimony that he had told employees "[o]n many, many occasions" that he could not make any promises. To state the view that decertification could be beneficial is permissible campaign rhetoric, as is a union representative's statement that decertification would not be beneficial.

The board said Walker's statement was a promise, but merely labeling a statement a promise does not make it so. A finding that a statement not *in haec verba* a promise must nonetheless be so interpreted requires some evidence in the record to support that interpretation. Nothing of record supports an inference that Walker's statement that going salaried "could be beneficial" was a promise. In the present record, no evidentiary basis exists for the board's finding that Walker's statement was a promise violative of § 8(a)(1).

(C) *Comparisons Made in Meetings and Letters.*

Each of the board's eleven findings based on pre-election statements to IBEW members being without support in the record, there remains in the pre-election picture only the comparisons made at the group meetings and in the three Rikard letters to IBEW members. The ALJ, as above indicated, viewed that evidence as presenting "a strong argument that the Company was correctly detailing the existing facts to employees in order that they could make an informed decision in the election." The ALJ in the IBPAT proceeding found that comparisons substantially identical to those made to IBEW members "did not interfere with employee free choice in the election," and the board adopted that finding in that proceeding. The substantially identical exhortations to vote "No" in the Rikard and McClure letters were apparently considered, as they are here, as permissible electioneering rhetoric.

▆ The record establishes that the comparisons made here are precisely the type described by the board in *Walgreen Co., supra,* as within the right granted an employer in § 8(c). The ALJ and the board effectively found the comparisons themselves in the IBEW proceeding free from coercion. Looking to the entire course of Dow's conduct, as it should, and noting the pre-election statements discussed above, the board found the comparisons at meetings and letters tainted as part of a campaign to "woo" the IBEW members from their union. The difficulty in that approach is that every election campaign is a wooing process, engaged in by the employer and union. If Dow, in all its challenged pre-election conduct, sought to woo its employees from the Union, that intent is of no moment in itself, an employer's "wooing," absent threats or promises, being specifically sanctioned by § 8(c) of the Act. *N.L.R.B. v. Gissel Packing Co., supra; N.L.R.B. v. Sidran,* 181 F.2d 671, 674–75 (5th Cir. 1950); *N.L.R.B. v. Laars Engineers, Inc.,* 332 F.2d 664, 665–67 (9th Cir.), *cert. denied,* 379 U.S. 930, 85 S.Ct. 325, 13 L.Ed.2d 342 (1964); *N.L.R.B. v. Enid Co-op Creamery Assoc.,* 169 F.2d 986 (10th Cir. 1948). Here, as above indicated, the view that eleven statements constituted "promises" and "unlawful interrogation" sufficient to have tainted the comparisons made at meetings and in letters is without support in the record.[12]

12. The board's brief makes much of Manager Kessler's testimony in the IBPAT proceeding as proof that the elections were conducted differently. The partially quoted testimony, however, related only to the events at meetings. Further, the board lacks candor in mischarac-

The board adopted one ALJ's finding that comparisons to IBEW members constituted violations. It also adopted another ALJ's finding that virtually identical comparisons to IBPAT members did not. The board distinguishes the former on the basis of statements found to be violations, a distinction that disappears, as above indicated, when those statements are viewed in light of the evidence and the law.

It has been recognized that a course or pattern of anti-union activity, or anti-union animus or hostility, may create an atmosphere in which otherwise seemingly innocuous statements may impede employees' free choice. *N.L.R.B. v. Kaiser Agricultural Chemicals, supra,* at 381. There is here, however, no finding and no evidence whatever of any such course or pattern, and no basis in law for distinguishing the comparisons made to IBEW members from those made to IBPAT members.

The board's findings that Dow violated § 8(a)(1) in its pre-election conduct in the IBEW election being without support in the record, enforcement of that portion of the board's order based on those findings must be denied, and its order setting aside the election must be vacated.

(2) *Post-Election Conduct of Dow.*

In the IBEW and IBPAT proceedings, the board found Dow's unilateral post-election transfer of employees to salaried status an unfair labor practice in two respects: first, as a § 8(a)(5) violation of its duty to bargain, and, second, as a § 8(a)(1) violation of its duty to refrain from interfering with the employees' § 7 rights in a possible rerun election. The board relied on its holding in *Presbyterian Hospital, supra,* that when a union loses a decertification election an employer may not withhold dues under a pre-existing bargaining agreement provision for dues checkoff, decline to transfer them to the union, and save them until the board resolves the union's election objections. The board there expressed the view that a union that has lost a decertification election remains the employees' bargaining representative until all union objections are resolved and the final election results have been validated by the board, and that a refusal to bargain during that interim period thus violates § 8(a)(5). The board's treatment of Dow's post-election conduct creates a case of first impression in this court.

The board's application of *Presbyterian Hospital* as a basis for holding Dow's post-election changes a violation of a duty to bargain under § 8(a)(5) conflicts with the rule applied in both proceedings by the ALJs here. Each held that Dow was free to place the employees on salaried status and grant raises, but that it did so *at its peril* while the union's election objections were pending. Sustaining the objections in the IBEW proceedings, that ALJ found Dow's post-election conduct a violation of § 8(a)(5) and § 8(a)(1). Rejecting the objections in the IBPAT proceeding, the other ALJ found Dow's same post-election conduct not a violation and dismissed the § 8(a)(5) and § 8(a)(1) allegations.

Before us, the parties describe the rule applied by the ALJs as having its origin in *Mike O'Connor Chevrolet-Buick-GMC Co.,* 209 NLRB 701 (1974), *enforcement denied on other grounds,* 512 F.2d 684 (8th Cir. 1975), and refer to that rule as "the *Mike O'Connor* rule." The rule, however, has a

---

terizing Kessler's testimony. When asked whether at any meeting he told the painters that if they voted to decertify "they would be transferred to salary status and receive the salaried schedule benefits," Kessler answered: "Absolutely not. With my prior experience in the electrician's campaign, I know what is and is not proper under the rules covered by the National Labor Relations Board, and we absolutely went out of our way to make sure we did not make any promises." The board's brief disingenuously recasts that testimony: "Kessler further testified that as a result of the Company's 'prior experience in the electricians' campaign' it had learned what was and was not 'proper under the rules covered by the National Labor Relations Act, and... absolutely went out of [its] way to make sure... [not to] make any promises." Neither the ALJs nor the board made any reference to Kessler's testimony, perhaps because Kessler did *not* say "as a *result* of the Company's" prior experience, or that "it had *learned*" what "*was* and *was not* " proper.

long pedigree reflected in decisions rendered by this court before and after *Mike O'Connor.*[13]

Under what we will also call the *Mike O'Connor* rule, an employer may make unilateral changes following a union victory in an initial representation election and before the employer's election objections are resolved, but does so *at its peril.* If the employer's objections are sustained, no duty to bargain with the union existed and a failure to bargain charge under § 8(a)(5) will be dismissed. *See N.L.R.B. v. Houston Chronicle Publishing Company,* 300 F.2d 273 (5th Cir. 1962). If the employer's objections are rejected, its duty to bargain relates back to the date of the election, and the employer's unilateral actions while objections were pending are automatic violations of § 8(a)(5). *See Anchortank, Inc. v. N.L.R.B.,* 618 F.2d 1153 (5th Cir. 1980).

Though *Mike O'Connor* involved an initial representation election won by the union, and the present case involves a decertification election lost by the union, we see no basis in law or justice for distinguishing between types of election or for distinguishing on a basis of which side won or lost. Moreover, we view the Act as requiring that its labor peace goals, as well as protection of workers' freedom to choose, be achieved by an even-handed application of the same rules of the game to all elections and to both sides.

As above indicated, the board rejected the ALJs' effective application of the *Mike O'Connor* rule, by holding that Dow's obligation to bargain continues after a union has lost a decertification election and until election objections are reviewed by the board, regardless of whether the election is ultimately held lawful. The impracticality of that approach in the present context is illustrated by the board's order to bargain

in the IBPAT proceeding. The board decertified IBPAT and, on the same day, ordered Dow to cease and desist from "[u]nilaterally changing the terms and conditions of employment of unit employees . . . prior to the final resolution concerning any question concerning the continuing representation of [IBPAT] . . . or any incumbent union." General Counsel's admission at oral argument that the board provided a highly technical remedy does not go far enough. The "remedy" was constructed of smoke.

There was no instant of time afforded by the board's order in which Dow would be able to bargain with a union that was not *board-decertified.* Ironically, the board noted that "Nothing herein is to be construed, however, as requiring [Dow] to rescind any of the wage increases or other benefits, the granting of which we have found to be unlawful." The order to bargain may at best be described as a general admonition, possibly applicable sometime in an unknowable future.

Beyond its impracticality, a broad application of *Presbyterian Hospital* to decertification elections lost by a union would deprive former union members of the right to express their choice in the election from the date of the election to the date on which the board completed its review of the election, and would do so whether the election was fair or unfair. In the present case, *Presbyterian Hospital* would have so deprived IBPAT members from September 22, 1978 until July 18, 1980—that is, for almost twenty-two months. Under *Mike O'Connor,* the choice expressed by union members is immediately honored. If the election is found to have been fair, that choice remains undisturbed. Only if the election is found to have been unfair is that choice overturned.

---

**13.** *See Anchortank, Inc. v. N.L.R.B.,* 618 F.2d 1153, 1156–57 (5th Cir. 1980); *N.L.R.B. v. Allis-Chalmers Corp.,* 601 F.2d 870, 874 (5th Cir. 1979); *N.L.R.B. v. W. R. Grace & Co., Construction Prod. Div.,* 571 F.2d 279, 282 (5th Cir. 1978); *General Electric Co., Battery Prod., Capacitor Dep't,* 400 F.2d 713, 717–18 (5th Cir. 1968), *cert. denied,* 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969); and *N.L.R.B. v. Laney & Duke Storage Warehouse Co.,* 369 F.2d 859, 869 (5th Cir. 1966). *See also Cone Brothers Contracting Co. v. N.L.R.B.,* 235 F.2d 37, 42–43 (5th Cir. 1956), *cert. denied,* 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122 (1956); and *N.L.R.B. v. Houston Chronicle Publishing Co.,* 300 F.2d 273 (5th Cir. 1962).

In *Presbyterian Hospital*, the board articulated policy and practical considerations it viewed as undergirding the concept that the result of a decertification election must be in limbo until the board resolved objections: "The well-established rule concerning election results is that they are not effective until certification [i. e. validation by the board] .... If the status of the parties were to change immediately upon the tally of ballots, the possibility of sustained objections and rerun elections might lead to a number of changes in the collective bargaining relationship before a representative is finally certified .... The general rule ... lends certainty and stability to the process since the parties may safely maintain the status quo until the representation question is conclusively resolved by the Board." *Presbyterian Hospital, supra* at 998, quoting *Trico Products Corp.*, 238 NLRB 1306 at 1307 (1978).

Though the foregoing articulation has the sound of superficial plausibility, it collapses when confronted with the *Mike O'Connor* rule. The latter rule, which the board chose not to mention in its Decision and Order, is not only more fair and practical, but meets the desiderata articulated by the board in *Presbyterian Hospital. Mike O'Connor's* requirement that an employer whose election objections are overruled must bargain retroactively about all post-election changes, thus restoring the duty-to-bargain *status quo* as of the date of the election, is fully applicable to the present circumstances. It is clear that a long-established union should not be destroyed immediately upon its loss of a decertification election, but *Mike O'Connor* causes no such result. The union continues to exist and, if its election objections are sustained, the employer must bargain retroactively with it. Further, the employees may elect at an appropriate time to return to the union. If, on the other hand, a union's objections are rejected and it has thus lost a fair election, no reason appears for requiring an employer to bargain with it, or for holding employees bound to it, throughout the pendency of its objections.

Moreover, the board is inaccurate in stating that the view broadly expressed in *Presbyterian Hospital* is "well-established," insofar as its application to an employer's general duty to bargain with a union that has lost a decertification election is concerned.[14] Before us, the board cites three cases: *Andor Company, Inc.*, 119 NLRB 925 (1957); *N.L.R.B. v. Albert Van Luit & Co.*, 597 F.2d 681 (9th Cir. 1979); and *Trico Products Corp., supra. Andor* did not involve an election, but dealt only with an employee petition for a deauthorization election to rescind a union security clause. The board said that *if* the employees voted to deauthorize it would be effective on board validation. *Luit* involved only the question of whether employee revocations of dues checkoff authorizations were valid during pendency of union objections to a deauthorization election. In *Andor* and *Luit*, the union necessarily continued as the recognized representative of the employees, the involved deauthorization elections relating only to continuance of specific provisions in bargaining agreements. In *Trico*, the election was between competing unions, the incumbent union lost, and the sole charge related to the employer's withholding and transfer of dues to the incumbent union. None of the cases cited by the board involved a charge of failure to bargain under § 8(a)(5) based on an employer's change to salaried status of employees who had voted to decertify their union.

14. *Presbyterian Hospital* was decided by the board during the year after the events involved herein. In *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) the court stated, "Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." Because *Presbyterian Hospital* is clearly out of line with the statutory design expressed in § 7 and § 159(a), its retroactive application by the board to the instant cases was the type of retroactivity condemned by law.

Enforcement of union dues checkoff and security clauses basically concern the relationship of employees to their union, with the employer only peripherally involved. The *Presbyterian Hospital* view may serve the purpose of maintaining financial integrity of a union which has merely lost a security clause deauthorization election, as in *Andor* and *Luit*. It may serve a similar purpose with respect to payment of dues checkoff money to a union that has lost an election to another union, as in *Trico*. We make no evaluation of the merits of *Presbyterian Hospital* as it may apply to the facts in those cases. It is sufficient here to indicate that it was inappropriately applied to the duty to bargain on change to salaried status amid the distinct facts in the present case.[15]

■ Before us, the board argues that if the *Mike O'Connor* rule were to apply to the outcome of a decertification election lost by a union, a victorious employer could profit by its own unfair labor practices— that is, an employer might thereby unfairly regain for a time its freedom to make unilateral changes if the union's election objections were ultimately sustained. In so arguing, the board disregards not only the employees' right to prompt recognition of their choice, but the effect of *Mike O'Connor's* requirement that an employer's freedom to make changes be rendered *conditional* while election objections are pending. Similarly, the board disregards the "heads I win, tails you lose" aspect of its insistence that the no-duty-to-bargain *status quo* must be changed immediately when a union wins a representation election, as required by *Mike O'Connor*, and that the duty-to-bargain *status quo* must not be changed when a union loses a decertification election. Nor does the board appear to recognize that a victorious union could profit by its own unfair labor practices when, as it should be, *Mike O'Connor* is applied to the outcome of a decertification election won by the union—that is, that a union might have un-

fairly impinged for a time upon an employer's autonomy to make unilateral changes (and on employees' freedom of choice) if the employer's election objections are ultimately sustained. Rules should not be designed on an assumption that either employers or unions are or are not likely to employ them unfairly. Nor, as above indicated, should the rule applied be dependent on which side wins. The board enjoys a "wide discretion over representation matters," *Brooks v. N.L.R.B.*, 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954), yet that discretion cannot reasonably encompass application of one rule governing creation of an obligation to bargain and application of a different rule governing dissolution of an obligation to bargain.

In its insistence that an employer's duty to bargain arises, and a new relationship is established, as soon as a union wins an election, but not the converse, the board confuses employees' freedom of choice with a policy favoring unions. Indeed, the board's brief describes *Mike O'Connor* as an "exception" adopted "to protect a union's status as the majority representative," and describes the issue here as "the continued status of the union," emphasizing the value in preserving stability in "established relationships." The recognized goals of a union-favoring policy have long been recognized. The board, and we, however, must be governed by the law. Section 7 of the Act provides that "[e]mployees shall [not only] have the right to self-organization, to form, join or assist labor organizations" but "shall also have the right to refrain from any and all such activities." *Presbyterian Hospital*, when employed to enforce continued bargaining with a union that has lost a fair decertification election, as the board did here in the IBPAT proceeding, results in a form of compulsory unionism in disregard of the employees' untainted and uninfluenced vote to become non-union, and a consequent denial of the employees' statu-

---

**15.** No issue respecting dues checkoff or union security clauses is presented in the present appeals. We need not hold in this case, therefore, that the *Mike O'Connor* rule, enabling unilateral employer changes *at peril* and providing for retroactive bargaining, would accommodate the balance of interests raised by those issues.

tory right of free choice under § 7 of the Act.

▮ Employment of *Presbyterian Hospital* to enforce a duty to bargain under the present circumstances is further inconsistent with the long-standing rule that an employer is under no obligation to bargain with a union if it has reasonable and good faith grounds for doubting the union's continued majority status.[16] *See N.L.R.B. v. Gissel Packing Co., supra* 395 U.S. at 597 n. 11, 89 S.Ct. at 1931 n. 11; *N.L.R.B. v. Leatherwood Drilling Co.*, 513 F.2d 270 (5th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); and *N.L.R.B. v. A. W. Thompson, Inc.*, 449 F.2d 1333 (5th Cir. 1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972). An employer having such a reasonable and good faith basis to doubt the union's continued majority status is not simply permitted but may be *required* by the Act to refrain from further bargaining with the union. *See ILGWU v. N.L.R.B.*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). A contrary view would nullify the employees' freedom of choice recognized in § 7 of the Act.

Section 8(a)(5) provides that a violation occurs only when an employer refuses to bargain with "the representative of his employees." That obligation is expressly "subject to the provisions of section 159(a) of this title." Section 159(a),[17] in turn, provides that employee representatives must be selected "by the majority of the employees." Here, the board insists that an employer must bargain with a union that has lost an election (with IBEW even if the board had not found the election unfair; with IBPAT even though the board did find the election fair and decertified the union). It is difficult to perceive, however, of a more firm and logical basis for a reasonable and good faith doubt of a union's majority status than the fact of its having lost a fair decertification election.

For all of the foregoing reasons, we reverse the board's findings of § 8(a)(5) post-election violations in both cases.

Respecting the finding of a § 8(a)(1) violation, this court long ago refused to extend to the post-election period the pre-election prohibition of that section against the employer's granting benefits. *N.L.R.B. v. Ambox, Incorporated*, 357 F.2d 138, 141 (5th Cir. 1966); *General Electric Co. v. N.L.R.B.*, 400 F.2d 713, 717 (5th Cir. 1968), *cert. denied*, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969). Accordingly, we reverse the findings of § 8(a)(1) violations based on post-election transfers to salaried status in both cases.

## CONCLUSION

We deny enforcement of the board's orders in both cases, vacate the order setting

---

16. The board contends that though Dow raised the issue of its good faith doubt in its brief to the board, it did not press it sufficiently to put the board on notice, and that Dow may not argue the matter before us. In answers to the complaints, Dow stated that since the filing date of the decertification petitions it "has had a good faith doubt of the Union's continued status as a representative of an uncoerced majority of the employees." There was, of course, no reason or basis for pressing before the board the matter of doubt as it related to Dow's post-election activities. Both ALJs considered those activities permissible, the ALJ in the IBEW proceeding finding that those activities constituted only a retroactive violation in view of what he considered pre-election violations. It was the board's election to inject its own view of Dow's post-election activities, finding them *per se* violations, that raises the issue of whether Dow had a good faith doubt justifying a refusal to bargain *after* the unions lost the elections.

17. Section 159(a), 29 U.S.C. § 159(a)

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment."

aside the election in the IBEW proceeding, and remand the latter proceeding to the board for further action consistent with this opinion.