ALLEGHENY LUDLUM
CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO–CLC, Intervenor
for Respondent.

No. 96–1040.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1996.

Decided Jan. 17, 1997.

Donald T. O'Connor, Pittsburgh, PA, argued the cause for petitioner, with whom Paul J. Corrado and Patrick L. Abramowich were on the briefs. Ralph H. Moore entered an appearance.

Vincent J. Falvo, Jr., Attorney, National Labor Relations Board, Utica, NY, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Peter D. Winkler, Supervisory Attorney, were on the brief.

Richard J. Brean, Assistant General Counsel, Pittsburgh, PA, argued the cause and filed the brief for intervenor United Steelworkers of America.

Before: WALD, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

Allegheny Ludlum Corporation ("the Company") manufactures specialty steel products at several sites in Western Pennsylvania. The United Steelworkers of America, AFL–CIO–CLC ("the Union") represents the Company's production employees, but no union represents the Company's salaried employees. In the summer of 1994, following a strike by the production employees, the Union initiated a drive to represent the salaried employees, and in early October the Union filed a petition with the National Labor Relations Board ("the Board") to represent these employees.

The company campaigned vigorously against the Union, hiring consultants to help it conduct an anti-unionization campaign.

This campaign included a video presentation which the salaried employees were required to watch during work hours, and which contained footage of several of these employees in their workplaces smiling and waving at the camera. The Company also mailed an anti-union newsletter called "Your Choice" to employees at their homes.

In the representation election held on December 2, 1994, the salaried employees rejected union representation by a vote of 237 to 225. On January 17, 1995, the Company fired James Borgan, a long-time salaried employee who had been heavily involved in the campaign for union representation. The Union filed complaints with the Board alleging that certain aspects of the videotaping project and the second edition of the "Your Choice" newsletter violated § 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 151–69, and that Borgan's termination, because motivated by his union activity, was in violation of § 8(a)(3) and (1) of the Act. The Administrative Law Judge ("ALJ") on July 28, 1995 found that the Company (1) by asking its employees whether they would permit the Company to use videotaped footage of them in an anti-union presentation had "polled" these employees regarding their union sentiment, without affording them the protections required under Board precedent to accompany such "polls"; (2) by sending them the second edition of the "Your Choice" newsletter had threatened to retaliate against them if they elected to be represented by the Union; and (3) had fired Borgan because of his union activity. On December 22, 1995, the Board affirmed the ALJ's decision and adopted the ALJ's recommended order on all three counts. *Allegheny Ludlum Corp.*, 320 N.L.R.B. 484, 1995 WL 798342 (1995).

The Company now petitions this court for review and denial of enforcement of the Board's decision, claiming that the Board's holding unreasonably restrains the Company's free speech rights under § 8(c) of the Act by effectively prohibiting the Company from including employees in videotapes used in a representation election campaign, and that the findings that the Company violated the Act through the second edition of the

"Your Choice" newsletter and the firing of James Borgan were not supported by substantial evidence. The Board cross-applies for enforcement of its order in full.

■ With regard to the videotaping procedure and the Board's "polling" finding, we conclude that the Board's precedents dealing with "polling," videotaping, and the free speech rights of employers create conflicting mandates, and that the Board has yet to articulate a clear standard to guide employers, employees, and its own administrative law judges in reconciling these mandates. Accordingly, we remand the case to the Board with instructions to develop a standard that is comprehensible to employers and that it will consistently apply to what appears to be a recurrent problem involving employer communications during an organizational campaign. As to the Board's findings that the second edition of the Company's "Your Choice" newsletter and the firing of James Borgan violated the Act, we find these elements of the Board's decision to be supported by substantial evidence, and accordingly we deny the Company's petition for review and grant the Board's petition for enforcement of the relevant portions of its order.

## I. BACKGROUND

### A. *The Videotaping of Employees*

A few weeks before the representation election, the Company began filming a videotape to be used as part of its campaign to persuade the salaried workers to vote against the Union. Mark Ziemianski, the Company's Manager of Communication Services, personally supervised the filming, which was conducted by an outside video crew. On November 14, 1994, Ziemianski and the video crew approached several employees in their workplaces and asked, without explaining the purpose of the filming, for their consent to be filmed. If the employees agreed to be filmed, they were instructed to sit at their desks and, upon hearing a cue, turn to face the camera, smile, and wave. The filming process took about two minutes for each employee.

On November 15, Ziemianski prepared two written notices stating that videotaping was being conducted "for an upcoming video presentation that the company will use to present the facts about your current election campaign," and advising employees who preferred not to appear in the presentation what they should do; one notice instructed objecting employees to notify either of two Company executives of their unwillingness to appear in the video, the second told them to notify the video crew. Ziemianski handed the notices to those employees whose workplaces he visited with the video crew on the 15th; he also sent notices through interoffice mail to a separate facility that he and the video crew planned to visit the next day.

James Goralka, one of the employees who had already been filmed on the 14th, saw one of the notices and called Joyce Kurcina, an executive named in the notice, to say that he and several of his co-workers preferred not to appear in the videotape. Kurcina told him to call Ziemianski, which he did, and Ziemianski agreed to honor Goralka's request if Goralka would put it in writing. Goralka sent Ziemianski a written notice listing the employees who had informed Goralka that they preferred not to appear in the videotape. Approximately thirty other employees also sent Ziemianski written notice of their desire not to be included in the video. Many employees complained to Union representative Peter Passarelli about the videotaping, and Passarelli in turn complained to Company Vice President Bruce McGillivray that the procedures surrounding the preparation of the videotape constituted unlawful "polling" of the employees regarding their union sentiments. The Company neither terminated nor altered the videotaping procedure, despite Passarelli's complaint.

B. *Edition # 2 of "Your Choice" Newsletter*

The Company's campaign against unionization also featured an anti-union newsletter called "Your Choice," which the Company prepared and mailed to the homes of salaried employees. The second edition of this newsletter contained the statement that, despite very difficult circumstances in the past, "the Company found ways to manage the situation without resorting to layoffs of salaried employees." This edition also featured several passages suggesting that unionization would lead to a reduction in job security, including an interview in which a former union member was quoted as saying "if it came to a layoff due to a lack of work, the first people to be laid off would be those in the Union," and a cartoon in which a rat on a leash held by an arm emblazoned with the Union's acronym pulls a blanket labeled "Secure Job at AL" off of a sleeping employee.

C. *The Termination of James Borgan*

James Borgan, a sixteen-year veteran of the Company's salaried nonexempt[1] workforce, was a leader in the Union's organizing drive leading up to the representation election. Borgan joined the Union's organizing committee, openly declared his support for the Union, attended union meetings, solicited fellow employees to sign union authorization cards, appeared in the Union's campaign video, was pictured in the Union's newsletters, and signed union letters and organizing literature. Borgan questioned management aggressively during meetings the Company held to discuss unionization issues, and one of the ALJ's findings which the Company does not challenge on appeal was that the Company violated the Act by disparaging and threatening comments a Company executive made to Borgan in one of their verbal exchanges about the forthcoming election. *Id.* at 487–88.

Within a few weeks of the election, Company executives decided to fire Borgan despite his consistently positive overall performance evaluations in the three prior years. Pursuant to this decision, Borgan's supervisor added two new criteria (labeled "Key Result Areas" or "KRAs") to Borgan's performance evaluation form for that year, and assigned Borgan "Unacceptable" ratings on both of these newly-added criteria. After a company witness testified before the ALJ that adding

---

**1.** The Act exempts from its coverage agricultural laborers, domestic services workers, people employed by parents and spouses, independent con- tractors, supervisors, and workers subject to the Railway Labor Act. *See* 29 U.S.C. § 152(3) (1994).

KRAs in mid-year was not unusual, the Company stipulated to a survey of its management showing that this midyear "add-on" practice was virtually unheard of. Borgan's supervisor, who had rated his performance in the preexisting criterion of "Development" as "Needs Improvement," also admitted, in her testimony before the ALJ, that she could not recall any particular shortfall in Borgan's performance in this area. Borgan's 1995 performance evaluation form also included an "Attendance" criterion. In this category, the supervisor rated Borgan's performance as "Needs Improvement," and wrote in the margin "missing from desk in November." Testifying before the ALJ, Borgan's supervisor admitted that Borgan's overall attendance record was "[a]lmost flawless," and that the low rating was due solely to the referenced incident, when Borgan was away from his desk for approximately an hour one afternoon in November, 1994. On cross-examination, the supervisor could not explain why, on this one occasion, she thought it appropriate to alert the controller of the Company after Mr. Borgan had been away from his desk for about thirty minutes ("At the time it struck me as an important thing"); nor could she reconcile Borgan's poor rating on this score with his actual pattern of overall attendance ("[Question]: So the flawless attendance record accounts [sic] for nothing, in rating attendance if you're away for one hour from your desk. Is that your testimony? [Answer]: I guess it is, yes.").

## II. DISCUSSION

We set aside the Board's decision only when the Board has "acted arbitrarily or otherwise erred in applying established law to the facts," *International Union of Elec., Elec., Salaried, Mach. and Furniture Workers v. N.L.R.B.*, 41 F.3d 1532, 1537 (D.C.Cir. 1994) (citations and internal quotation marks omitted), or when its findings of fact are not supported by "substantial evidence" in the record considered as a whole. *See* 29 U.S.C. § 160(e) (1994); *see also Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### A. The Videotaping of Employees

The Board affirmed the ALJ's finding in this case that the Company's "actions with respect to its videotaping of employees constitute[d] unlawful polling of employees" in violation of § 8(a)(1). *Allegheny Ludlum Corp.*, 320 N.L.R.B. at 490. The most critical part of that finding is that the Company, through the actions of Ziemianski in distributing the notices and orally advising employees that they must submit written notices to be excluded from the Company's anti-union video, had in effect "polled" the employees regarding their union sentiments. *Id.* at 484. Although this part of the Board's decision drew support from prior Board decisions regarding unlawful "polling," it raises in stark form the fundamental question of whether employers can ever legally include visual images of employees in campaign materials *without* running a heavy risk of later being found in violation of the Act for illegally "polling" their employees. For, as we explain in greater detail below, another recent Board decision explicating the employer's obligation to obtain the consent of all employees featured in anti-union videotapes may have put the Board's "polling" doctrine on a collision course with the free speech rights of employers under § 8(c).

### 1. Employer "Polling" of Employees and Section 8(a)(1)

Section 7 of the Act gives all nonexempt employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157 (1994). Section 8(a)(1) of the Act makes it an illegal "unfair labor practice" for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1) (1994).

In its 1967 *Struksnes* decision, the Board observed that an employer's "polling" of its employees regarding their pro-union or anti-union sentiment was usually both a violation of the employees' § 7 rights in itself, and a likely prelude to further and more severe

such violations. *See Struksnes Construction Co.*, 165 N.L.R.B. 1062 (1967). An employer "poll" may in itself interfere with employees' exercise of their § 7 rights because "any attempt by an employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of unionism and, therefore, tends to impinge on his Section 7 rights." *Id.* at 1062; *see also Cannon Electric Co.*, 151 N.L.R.B. 1465, 1470 (1965) ("Coercion by interrogation is one of the 'subtler' forms of management's interference with labor's protected rights." (quoting *N.L.R.B. v. Camco*, 340 F.2d 803, 804 (5th Cir.1965))); *overruled on other grounds by Resistance Technology*, 280 N.L.R.B. 1004, 1986 WL 54042 (1986). An employer "poll" also may lay the groundwork for further violations of § 7 rights because "[a]n employer cannot discriminate against union adherents without first determining who they are." *Id.* (quoting *Cannon Electric Co.*, 151 N.L.R.B. at 1468). The Board observed that in "innumerable cases" employer "polling" had been the "prelude" to employer discrimination against union sympathizers, and thus concluded that employer "polling" was not only a necessary precursor to discrimination but also an affirmative signal that discrimination would follow. *Id; see also Cannon Electric Co.*, 151 N.L.R.B. at 1468 ("The frequency of a pattern of employer conduct associating discrimination against union adherents with employer's efforts to learn the names of union activists supports the conclusion that there is a 'danger inherent' in such conduct: a tendency toward interference with the exercise by employees of their organizational rights." (citations omitted)).

Prior to *Struksnes* the Board had originally held that employer "polling" was a *per se* violation of § 8(a)(1),[2] but later modified its position to permit employer "polling" provided that "proper safeguards" attended the "polling" to ensure that it did not interfere with, restrain, or coerce employees in the exercise of their § 7 rights. *Blue Flash Express*, 109 N.L.R.B. 591, 593 (1954). In *Blue Flash Express* the Board held that employer interrogation of employees regarding their union sentiments does not violate the Act unless, "under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act." *Id.* at 593. But this somewhat abstract standard soon proved too diffuse to give the Board's subsequent "polling" cases consistency or to discourage the intimidation of employees by employer polls, and in *International Union of Operating Engineers v. N.L.R.B.*, 353 F.2d 852 (D.C.Cir.1965), this court remanded a "polling" case to the Board with instructions to "come to grips with this constantly recurring problem for the protection of the employees as to their section 7 rights and for that of an employer acting in good faith." *Id.* at 856 (citations omitted). In *Struksnes* the Board attempted to carry out this court's mandate by holding that "polling" does not violate the Act if it satisfies a five-part standard:

> Absent unusual circumstances, the polling of employees by an employer will be violative of Section 8(a)(1) of the [Act] unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) this purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot, and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere.

*Struksnes*, 165 N.L.R.B. at 1063.

The more general *Blue Flash Express* approach to employer inquiries survived outside the "polling" context, however, although it has not always been possible to see where or why the Board draws the line between "polling" and other types of "interrogation" in individual fact scenarios. In general, suspicious employer actions are addressed under

---

**2.** *See Standard–Coosa–Thatcher*, 85 N.L.R.B. 1358, 1360 (1949) ("Whenever an employer directly or indirectly attempts to secure information concerning the manner in which or the extent to which his employees have chosen to engage in union organization or other concerted activity, he invades an area guaranteed to be exclusively the business and concern of his employees.").

the rubric of "interrogation" when they are directed at individual employees,[3] and when they involve isolated incidents [4] or spontaneous casual interactions between employees and agents of the employer [5]; "polling" analysis, on the other hand, is reserved for situations where the employer's actions have a broader, more systematic and more deliberate character.[6] We reiterate, however, that the Board has rarely articulated its rationale for choosing "polling" analysis over "interrogation" analysis in particular decisions, and some of its choices between the two defy classification.[7]

It is of course obvious that an employer can effectively "poll" its employees through means other than formal surveys or conventional voting-preference "polls." What kind of employer actions constitute a "poll" does not depend on their formal nomenclature; the key is their practical effect of tending to instill in employees a reasonable belief that the employer is trying to find out whether they support or oppose the union. Thus, this circuit has itself applied *Struksnes* criteria in the context of an employer-organized vote over whether temporary employees belonged in a bargaining unit, on the rationale that this vote was really a vote on union representation since the employer and the union had openly advocated contrary positions on the scope of the bargaining unit. See *Midwest Reg'l Joint Bd. v. N.L.R.B.*, 564 F.2d 434, 444–45 (D.C.Cir.1977). The Board, too, has

3. See, e.g., *Rossmore House*, 269 N.L.R.B. 1176, 1984 WL 36297 (1984) (applying "interrogation" analysis to the allegation that an employer had twice asked the same employee about the employee's support for the union).

4. See, e.g., *Crest Industries Corp.*, 276 N.L.R.B. 490, 1985 WL 46217 (1985) (applying "interrogation" analysis to the allegation that an employer's representative had approached a group which included union representatives and four employees and, after one of the union representatives told him that a majority of the employees supported the union, turned to the four employees and asked "Is this what you want?").

5. See, e.g., *Douglas Div., Scott & Fetzer Co.*, 228 N.L.R.B. 1016, 1977 WL 8482 (1977) (applying "interrogation" analysis to allegations based on several casual conversations between employees and representatives of the employer), *rev'd by N.L.R.B. v. Douglas Div., Scott & Fetzer Co.*, 570 F.2d 742 (8th Cir.1978) (holding that the employer "interrogations" were too "isolated and insubstantial" to justify the remedy invoked by the Board).

6. *Compare N.L.R.B. v. Harry F. Berggren & Sons*, 406 F.2d 239, 244–45 (8th Cir.1969) (enforcing the Board's finding that an employer violated § 8(a)(1) by conducting a formal "poll" which took place in a non-coercive atmosphere, but which met only four of the five components of the *Struksnes* standard) *with Reliance Insurance v. N.L.R.B.*, 415 F.2d 1, 4–6 (8th Cir.1969) (refusing to extend *Harry F. Berggren & Sons*, which dealt with "systematic polling," to a case involving "an isolated and casual question"); *see generally* 1 Patrick Hardin, The Developing Labor Law 119–26 (3rd ed.1992) (summarizing cases involving "polling," and those involving "[i]ndividual or isolated questioning," in separate subsections); Annotation, *Employer's right, under § 8(a)(1) of National Labor Relations Act (29 USCS § 158(a)(1)), to ask employee whether employee intends to participate in strike*, 72 A.L.R.

Fed. 818, 827–41 (1985) (summarizing cases involving "polls" and those involving "[q]uestioning individual employees," and "[q]uestioning particular groups of employees" in separate sections).

7. In *Rossmore House, supra* note 3, the allegedly coercive employer inquiries involved only one employee. But the next year, the Board affirmed an ALJ's rejection of both "interrogation" and "polling" allegations premised on an employer's agent having personally asked four employees whether they favored union representation. See *Crest Industries Corp., supra* note 4. The ALJ in *Crest Industries* cited and applied *Rossmore House*, but also referred to the inquiry as a "poll"; he acknowledged that it had not been conducted in accordance with the standards set forth in *Struksnes*, but he did not identify "unusual circumstances" that would excuse the "poll" from the *Struksnes* requirements. See *id.* at 494. And in a 1992 case the Board affirmed the findings of an ALJ who applied the *Rossmore House* standard, without using the term "polling" or citing *Struksnes*, in evaluating the legality under the Act of a formal survey that an employer had distributed to *all* of its employees. See *Pro/Tech Security Network*, 308 N.L.R.B. 655, 1992 WL 221843 (1992).

Although the dispositive inquiry in determining whether an employer's actions constitute a violation of § 8(a)(1) is their probable effect on reasonable employees, rather than the employer's intent in engaging in the actions, see *Teamsters Local Union No. 171 v. N.L.R.B.*, 863 F.2d 946, 954 (D.C.Cir.1988), it has sometimes been suggested that *Struksnes* is implicated only when the employer's intent was in fact to determine whether a majority of employees supported the union. See, e.g., *Chauffeurs, Teamsters and Helpers, Local 633 of New Hampshire v. N.L.R.B.*, 509 F.2d 490, 494 n. 17 (D.C.Cir.1974); *American Steel Building Co.*, 270 N.L.R.B. 11, 11 n. 2, 1984 WL 36348 (1984).

found that an employer engaged in unlawful "polling" when its agents organized a betting pool for employees on the outcome of an upcoming representation election, *Wellstream Corp.*, 313 N.L.R.B. 698, 698 n. 2, 704, 1994 WL 66661 (1994), personally passed out hats bearing the message "Vote No" to employees, *Laidlaw Transit*, 310 N.L.R.B. 15, 17, 1993 WL 6539 (1993), or personally asked employees to let themselves be photographed holding anti-union signs, *Florida Steel Corp.*, 224 N.L.R.B. 587, 588–89, 1976 WL 7060 (1976). By the same token, the Board has held that merely making "Vote No" stickers available upon the employees' request does not constitute "polling." *See Holsum Bakers of Puerto Rico*, 320 N.L.R.B. 834, 839, 1996 WL 69107 (1996). In all of these cases, the Board has declared the determinative issue to be whether the employer's actions would tend to give employees the reasonable impression that the employer was attempting to discern their union sentiments. The *Laidlaw Transit* and *Holsum Bakers of Puerto Rico* decisions illustrate the contrast most dramatically. Although the formal character of the employer's actions (distributing "Vote No" paraphernalia to employees) was similar in both cases, only in *Laidlaw* were the actions held to constitute "polling" because by personally tendering "Vote No" hats to individual employees, the employer's agents put these employees "in the position of disclosing their preference for or against the Union by the acceptance or rejection of the hats," *Laidlaw Transit*, 310 N.L.R.B. at 17, whereas by "[m]erely making the 'Vote No' stickers available, or honoring employee requests for them," the employer's agents in the latter case did not "pressur[e] employees into making an observable choice or open acknowledgment" concerning their union sentiments. *Holsum Bakers of Puerto Rico*, 320 N.L.R.B. at 839 (quoting *Schwartz Mfg. Co.*, 289 N.L.R.B. 874, 879, 1988 WL 214122 (1988)).

### 2. *Employer Free Speech and Section 8(c)*

Responding to the charge that aggressive enforcement of § 8(a)(1) had made it exces-

sively difficult for employers to engage in any form of non-coercive communications with employees regarding the merits of unionization,[8] Congress in the 1947 Taft–Hartley Amendments[9] to the Act added § 8(c), which provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (1994). In *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court noted that § 8(c) "merely implements the First Amendment" by establishing "an employer's free speech right to communicate his views to his employees." *Id.* at 617, 89 S.Ct. at 1941. The Court also observed, however, that "[a]ny assessment of the precise scope of employer expression ... must be made in the context of its labor relations setting," and that "an employer's rights cannot outweigh the equal rights of the employees to associate freely." *Id.*

In its "polling" cases, the Board has consistently and firmly rejected the argument that employer "polling" is expression protected by § 8(c). *See Struksnes*, 165 N.L.R.B. at 1062 n. 8 ("It is well established that an employer, in questioning his employees as to their union sympathies, is not expressing views, argument, or opinion within the meaning of Section 8(c) of the Act, as the purpose of an inquiry is not to express views but to ascertain those of the person questioned" (citing *Martin Sprocket & Gear Co. v. N.L.R.B.*, 329 F.2d 417 (5th Cir.1964) and *N.L.R.B. v. Minnesota Mining & Mfg. Co.*, 179 F.2d 323 (8th Cir.1950))); *Cannon Electric*, 151 N.L.R.B. at 1469 ("Interrogation, particularly systematic polling of employees as to their union sympathies, is not an expression of 'views, argument, or opinion' within the meaning of Section 8(c). The purpose of interrogation is not to express views, but to ascertain those of the person

---

8. *See* Paul D. Snitzer, *Employer Free Speech—The Emergence of a Conflict Between the Board and the Circuits,* 11 LAB. LAW. 247, 247–50 (1995).

9. Pub.L. No. 80–101, 61 Stat. 136.

interrogated." (citation omitted)); *Standard–Coosa–Thatcher,* 85 N.L.R.B. at 1363 ("[W]e again reject the contention that interrogation is protected by Section 8(c) of the amended Act.... [T]he purpose of [§ 8(c) ] is to permit an employer to express his views, not to license him to extract those of his employees. The employer is explicitly accorded a right to 'influence' his employees by verbal appeals to reason, but not to fear." (citations omitted)).

### 3. *Employer Videotaping of Employees and Section 8(a)(1)*

In *Sony Corp. of America,* 313 N.L.R.B. 420, 1993 WL 497344 (1993), the Board affirmed an ALJ's finding that an employer had violated § 8(a)(1) by videotaping its employees, and using the footage in an anti-union presentation, without obtaining their consent. *See id.* at 428–29. The ALJ held that this unconsented use of their videotaped images interfered with the employees' right "to assist and support the Union if they so desired," because "employees who might wish to speak out in support of the Union would be hesitant to do so after seeing their pictures in an antiunion presentation," whether from sheer humiliation and embarrassment or from a feared inability to explain the videotape's implied message that they opposed the union. *Id.* at 428.

### 4. *Post–Sony Videotaping of Employees, Section 8(c), and "Polling"*

An employer seeking to use filmed images of employees in its campaign against unionization now faces a wide array of potentially conflicting standards. On the one hand it is undisputed that § 8(c) protects an employer's pure right to express an anti-union message to its employees, subject to certain limitations described in *Gissel* as necessary in order to prevent encroachment on employees' § 7 rights. Thus, an employer might conclude that under § 8(c) it has the right to make an anti-union videotape including footage of contented employees, as a necessary component of the message it wishes to express. But should the employer prepare

such a videotape, an obligation may well attach under the *Sony* decision that the employer obtain the consent of the employees included in the tape before displaying it to other employees. Therein lies the rub: the Board's "polling" cases suggest that by soliciting its employees' consent to be included in the anti-union videotape, the employer may be in effect "polling" them as to their union sentiments, in violation of § 8(a)(1).[10]

We note that whether this consent solicitation would constitute an unlawful interference with § 7 rights does not turn on the malevolence or innocence of the employer's *intent* in seeking the employees' consent; rather, the relevant question is whether the solicitations would tend to create among the employees a reasonable *impression* that the employer was trying to discern their union sentiments. *See Teamsters Local Union No. 171 v. N.L.R.B.,* 863 F.2d 946, 954 (D.C.Cir. 1988) (noting that the "proper question" in determining whether an employer has violated § 8(a)(1) by interfering with employees' exercise of their § 7 rights is "whether the employer engaged in conduct which may reasonably be said to tend to interfere with the free exercise of employee rights under the Act" (quoting *Southwest Regional Joint Bd. v. N.L.R.B.,* 441 F.2d 1027, 1031 (D.C.Cir. 1970) (quoting *Joy Silk Mills v. N.L.R.B.,* 185 F.2d 732, 740 (D.C.Cir.1950)))); *see also Struksnes,* 165 N.L.R.B. at 1062 ("[A]ny attempt by an employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of unionism and, therefore, tends to impinge on his Section 7 rights."); Derek C. Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv. L.Rev. 38, 106 (1964) ("By indicating through his questions that he desires to learn about the sympathies and activities of individual employees, the employer may convey an impression, rightly or wrongly, that he is considering reprisals against union supporters.").

10. Because the employer's attempt to locate individuals from among its workforce who would consent to appear in its video presentation will most often be conducted in a structured, deliberate manner, the "polling" charge seems more likely to be attributed to these actions than any charge of coercive "interrogation." *See supra* notes 3–6 and accompanying text.

The possibility that an employer's intent in making these consent requests is entirely innocent of any desire to determine individuals' attitudes toward the union does, however, demonstrate the inadequacy of the Board's earlier assurances that "polling" cannot involve protected expression. *See Struksnes,* 165 N.L.R.B. at 1062 n. 8; *Cannon Electric,* 151 N.L.R.B. at 1469; *Standard–Coosa–Thatcher,* 85 N.L.R.B. at 1363. When it issued its earlier pre-*Sony* decisions declaring that § 8(c) may not successfully be invoked in defense of a "polling" allegation, the Board may not have foreseen that employer expression involving anti-union filmed presentations would trigger the obligation to seek employee consents, which in turn would raise the specter of employer "polling."

That failure of prescience notwithstanding, we are confused and troubled by the sharply inconsistent approaches that the Board's ALJs have taken to the convergence of issues presented by post-*Sony* videotaping of employees. That inconsistency compels this court to again call upon the Board, as we did in *International Union of Operating Engineers,* to "come to grips with [a] constantly recurring problem for the protection of the employees as to their section 7 rights and for that of an employer acting in good faith." *International Union of Operating Eng'rs,* 353 F.2d at 856. In the case at bar, the ALJ held that the employer's solicitation of its employees' consent to appear in the videotape constituted unlawful "polling." In so holding, the ALJ made no mention of the § 8(c) rights of the employer. *Allegheny Ludlum Corp.,* 320 N.L.R.B. at 489–90. In another recent case involving employer videotaping of employees, *Flamingo Hilton–Reno,* 321 N.L.R.B. No. 53, 1996 WL 293527

(1996), however, a different ALJ held that videotaping employees and afterwards requesting their consent to be featured in an anti-union presentation did not violate the Act.[11] The ALJ in *Flamingo Hilton–Reno* noted that "there [was] no contention that the [employer] did not have a right to produce the video," and assumed, without explanation, that the employer's § 8(c) right included the "right to produce campaign videos that portray employees performing their work or otherwise appearing to enjoy the camaraderie of their coworkers." *Id.* at \*15–16. The ALJ did not expressly address the "polling" concerns raised by the consent solicitations, nor did he attempt to balance the § 8(c) freedom of expression right of the employer against the § 7 associational rights of employees, in evaluating the consent protocol.

The Board has a duty to provide conscientious employees, employers, unions, and adjudicators striving to stay within the strictures of the Act with some clear guidelines as to how to proceed in regard to company videotaping of employees. As long as administrative law judges may resolve the potentially conflicting mandates of § 8(a)(1) and § 8(c) implicated in such situations either by deferring to the employer's free speech right and ignoring the employees' right to be free of unlawful "polling," or by citing "polling" concerns and ignoring the employer's free speech right, employers will have no clear notice of what the Act prohibits in this context. Clearly *some* methods of soliciting employees to appear in anti-union video presentations would not raise significant "polling" concerns; for example, the company might seek to include only those employees who have on their own initiative clearly expressed

---

**11.** As of this writing, the Board has not yet issued a final ruling as to this portion of the ALJ's opinion. The Board severed this portion of the proceeding pending further consideration. *See id.* at \*3 n. 3. On June 12, 1996, the Board issued a Notice of Hearing scheduling oral argument for August 7, 1996, and directing the parties to prepare to argue these five questions: (1) how, and at what point, may an employer solicit employees' consent to appear in campaign videotapes or photos without violating employees' Section 7 rights?; (2) how can the Board ensure that a party's interest in using videotapes as campaign propaganda does not intrude upon the

Section 7 rights of employees?; (3) what standard should the Board apply to determine whether photographing or videotaping of employees is an unfair labor practice and/or objectionable conduct?; (4) what weight, if any, should the Board give to evidence that the purpose of the photographing or videotaping was explained to employees?; and (5) are there other factors that the Board should consider in determining whether photographing or videotaping is coercive and/or objectionable conduct? Notice of Hearing, Case 32–CA–14378 and Case 28–RC–5274 (June 12, 1996).

opposition to union representation. But once we leave that safe harbor the water gets rough; if a post-filming request for permission always amounts to "polling," does the *Struksnes* standard for "polling" still apply? An affirmative answer would surely condemn most such videotaping. And even within the safe harbor, how far employers may go in making inquiries to locate those who are overtly against the union will depend on how likely it is that such inquiries would tend to give *other* employees the reasonable impression that the employer is attempting to discern *their* sentiments. Such determinations are well suited to the Board's expertise and experience, and we call upon them now to exercise it in this recurrent situation of employer videotaping of employees. Accordingly we set aside this portion of the Board's order and remand this case for further consideration and the articulation of a clearer Board policy as to how the employers may lawfully proceed.

### B. *Edition # 2 of the "Your Choice" News-letter*

■ The ALJ found that the Company had additionally violated § 8(a)(1) through a combination of items it published in the second edition of its "Your Choice" newsletter distributed to salaried employees. In the Board's view the items in effect threatened layoffs of salaried employees if they voted in favor of unionization. *Allegheny Ludlum,* 320 N.L.R.B. at 484, 490–92. First, there was an interview of a former union member who stated that "if it came to a layoff due to a lack of work, the first people to be laid off would be those in the Union." Second was the cartoon of a Union rat pulling the job security blanket off a sleeping employee. Finally, there was an ominous reference to the Company's past attempts to keep the salaried employees' jobs intact. After describing past poor business conditions, layoffs of union employees, and a recent strike, the newsletter noted that "[i]n all of these cases, the Company found ways to manage the situation without resorting to layoffs of salaried employees." The message was clear—it would not look so hard in the future, if the Union won.

In *Gissel,* the Supreme Court reviewed the Board's holding that an employer had violated § 8(a)(1) by two speeches in which the company's president told the employees that the Union's only economic weapon was its ability to call for a strike, and warned that a strike could lead to plant closings and layoffs, and by two pamphlets sent to employees in which the employer claimed that the Union was "strike-happy," and listed local companies that had gone out of business because of unreasonable Union demands. *See Gissel,* 395 U.S. at 587–89, 89 S.Ct. at 1926–27. The Court, while acknowledging the employer's freedom of expression protected by § 8(c), held that these communications constituted unfair labor practices in violation of § 8(a)(1) because associating unionization with adverse consequences for employees is protected only if it is merely a "prediction as to the precise effects [the employer] believes unionization will have on his company," and not an "implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him." The latter type of statement is an unlawful threat of retaliation for employee unionization, *id.* at 618, 89 S.Ct. at 1942, and this is how the ALJ and the Board treated the communications in this case.

■ In reviewing the Board's finding, we "must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel,* 395 U.S. at 620, 89 S.Ct. at 1943 (quoting *NLRB v. Virginia Elec. & Power Co.,* 314 U.S. 469, 479, 62 S.Ct. 344, 349, 86 L.Ed. 348 (1941)). Under this standard, and applying the criteria distinguishing permissible from impermissible employer communications set out in *Gissel,* we agree with the Board's finding that "Your Choice, Edition # 2" violated the Act because three elements of that newsletter—the Karen Gallagher interview, the cartoon, and the statement that salaried employees had retained their jobs in the past because the Company had "found ways" to keep them on the rolls—combined to create an unlawful threat that the Company would retaliate against salaried employees if they elected to be represented by the Union.

As our colleague observes in her partial dissent, judges must be sensitive to the context in which employer statements are made, when determining whether they include "threats" or "promises" that violate the Act. *See* concurring and dissenting opinion at 1369; *but see id.* at 1370–71 n. 2 ("Having conceded [that the Karen Gallagher interview did not violate the Act by its inclusion in the video, the Board] cannot also argue that the same statements violate the Act if included in a newsletter."). This insight is helpful insofar as the newsletter's "threat of reprisal" arose from the *combination* of three elements of the newsletter; that is, each element must be considered in the context of the others, rather than in vacuo. *But see id.* at 1369–70 (analyzing each of the three elements of the newsletter in vacuo). The general context in which "Your Choice, Edition # 2" was distributed was a unionization campaign in which job security was foremost among the salaried employees' concerns, and in which the Union had campaigned on the ground that it could increase job security for the salaried employees. In this context a salaried employee would no doubt be troubled by the statement, spoken by an employee but quoted in a Company newsletter and thus demonstrably concurred in by the employer, that "if it came to a layoff due to lack of work, the first people to be laid off would be those in the Union." [12] A reader considering joining the Union would presumably want to know why being in the Union makes one more likely to face the ax; if this tendency on the part of the employer is motivated by the bare fact of Union membership, such a reader will have a powerful incentive to vote against Union representation which the Union is helpless to counteract. Add to this the

cartoon in which a Union rat pulls the "Secure Job" blanket off of a sleeping employee, which our colleague interprets as a "statement, albeit a blunt one, that AL employees currently enjoy job security." Concurring and dissenting opinion at 1370. We think the more natural interpretation is that the election of Union representation would lead to a *decline* in job security—the Union rat is, after all, *pulling off* the "Secure Job" blanket. The Gallagher quote and the cartoon thus reinforce each other in conveying the employer's threat that if the salaried employees elected Union representation the employer would react by increasing layoffs, and the newsletter includes no statement or information to counteract the threatening implication that such a result would be the product of the employer's unilateral action—that it would be, in other words, the employer's retaliation against the employees for bringing in the Union. The newsletter's only hint of an explanation as to why the Company treats unionized employees differently from non-unionized employees with regard to layoffs actually served to intensify the threatening character of the employer's message: the Company explained that in the past it had "found ways" to keep the non-unionized salaried employees on board. Thus the Company conveyed the following message to the salaried employees: the Company "found ways" to avoid laying you off when you were not represented by the Union, but is more inclined to lay off workers who are represented by the Union, and by electing Union representation you will be letting yourselves in for a decline in job security.[13]

Applying the analysis articulated by the Supreme Court in *Gissel* to these employer communications, it is clear that we have even

---

**12.** We disagree with our colleague's assertion that by a "fair reading" this statement refers only to "what [Gallagher's] previous employer had done." Concurring and dissenting opinion at 1370. Gallagher's statement is clearly proffered in the newsletter as the expression of someone currently employed by Allegheny Ludlum, describing her current situation. Our colleague refers to Gallagher's testimony explaining her comments, *see id.*, presumably to support this "fair reading." Of course, employees reading the "Your Choice" newsletter in the time leading up to a representation election could not supplement the statements printed in the newsletter

with testimony given at a deposition that would not take place until months after the election had taken place.

**13.** We note that neither we nor the Board found objectionable those portions of the newsletter that describe the Company's record of protecting job security in the past, such as those quoted by our colleague at pages 1369, and we are thus confused as to how our holding could be thought to prevent employers from defending their past record. *Cf.* concurring and dissenting opinion at 1370.

greater support for upholding the Board's finding of an unlawful "threat of retaliation" than did the *Gissel* Court. In *Gissel*, the Court upheld the Board's finding of a "threat of reprisal" based on an employer's speeches, pamphlets, leaflets, and letters combining to convey the message "that the company was in a precarious financial condition; that the 'strike-happy' union would in all likelihood have to obtain its potentially unreasonable demands by striking, the probable result of which would be a plant shutdown, as the past history of labor relations in the area indicated; and that the employees in such a case would have great difficulty finding employment elsewhere." *Gissel*, 395 U.S. at 619, 89 S.Ct. at 1943. Because the employer conveyed this message without having any support for its "basic assumption" that the union would have to strike to be heard, or for its assertion that local plant closings were attributable to unionism, and because the Board had often found that employees "take such hints as coercive threats rather than honest forecasts," the Court upheld the Board's finding that this message was a "threat of reprisal" and therefore a violation of the Act. *Id.* at 619–20, 89 S.Ct. at 1942–43. The *Gissel* Court thus upheld the Board's finding of a violation even though the employer's proffered link between unionization and layoffs was explicitly premised on an intervening causal factor within the union's control—the decision to strike. In that case the union at least had *some* recourse to parry the employer's thrust, since the union could respond by asserting that it would not strike if it thought that doing so would force the company to lay off its members. In the case at bar, no such defense was available to the Union. Even if the Union could have convinced the salaried employees that it would act responsibly, with a view to economic circumstances and the workers' best interests, it could not dull the impact of the Company's threat to lay off salaried employees in retaliation for their having elected Union representation.

The Company argues on appeal that this ruling contradicted this circuit's recent treatment of similar employer communications in *Crown Cork & Seal v. N.L.R.B.*, 36 F.3d 1130 (D.C.Cir.1994), and *Somerset Welding &*

*Steel v. N.L.R.B.*, 987 F.2d 777 (D.C.Cir. 1993). But we find that the absolved communications in those two cases were significantly different from the threatening combination of messages contained in the second edition of the "Your Choice" newsletter.

The employer communications in *Crown Cork & Seal* featured assertions that the Union had a bad record in protecting job security, and this statement: "WE WILL NOT BRING WORK INTO THIS PLANT— AND OUR CUSTOMER WILL SEEK OTHER ALTERNATIVES—IF THAT WORK CAN'T BE DONE AT A REASONABLE COST, a cost that allows both of us to make a fair return on our investment." *Crown Cork & Seal*, 36 F.3d at 1133. We disagreed with the Board's holding that this statement was a "threat of retaliation" for unionization, and observed that by referring to the pressure of economic necessity and the probable effects that wage increases would have, the company was simply identifying circumstances beyond its control, rather than connecting post-unionization layoffs to "discretionary" decisions it might make solely on the basis of its opposition to unionization. *Id.* at 1137. Specifically, the company's dour prediction was based on the facts that the company and the union had entered into a "Master Agreement" which triggered automatic wage increases for newly-unionized employees, and that the market for the company's product was very tight, which meant that wage-related cost increases could well make it impossible for the company to compete. *Id.* at 1132–33.

The employer communications addressed in *Somerset Welding & Steel* involved a supervisor's showing employees a financial report indicating that the company's profit margin was quite narrow and his telling the employees "there'd be no way that the shop could continue to go" in the event of wage increases, along with a chairman's statements that unionization at other companies in the area had led to plant closings, and that any increases in employee wages could threaten the company's ability to compete and might necessitate a restructuring of employee benefits. *Somerset Welding & Steel*, 987 F.2d at 780; *Somerset Welding & Steel*,

314 N.L.R.B. 829, 830–31 (1994). Finding insufficient record evidence to support the ALJ's findings that these communications violated the Act, we remanded them to the Board. (The Board had not originally passed on these findings, having concluded that a remedial bargaining order was required by other violations in any event.) On remand, the Board itself held that they did not violate the Act. *See Somerset Welding & Steel,* 314 N.L.R.B. at 830–31.

*Crown Cork & Seal* and *Somerset Welding & Steel* addressed employer statements that linked unionization to the loss of job security by referring expressly to factors outside of the employer's control—union pressure to increase wages and market conditions. The employers in those two cases were communicating to employees their prediction that if the employees voted to unionize, the companies would be obliged to increase wages for the newly-unionized employees, and this in turn would damage the employers' ability to attract business in light of market conditions. *See* Bok, *supra,* at 77 ("When the employer declares that he will have to move or close down if a union comes in and obtains higher wages, union organizers can reply that their negotiators will take account of the company's position and endeavor not to induce its departure from the area.... [M]uch may turn on whether the employees understand that the employer will close down only if economic considerations impel him to do so....").

In contrast to such predictive communications, the second edition of "Your Choice" in effect told salaried employees that unioniza-tion would lead to layoffs and a loss of job security because once the salaried employees chose union representation the Company would no longer "find ways" to avoid laying them off in hard times.[14] This implied threat distinguishes the case from *Crown Cork & Seal* and *Somerset Welding & Steel,* and justifies the ALJ in holding that this employer communication fell on the "threat of retaliation" side of the *Gissel* dividing line.

## C. The Termination of James Borgan

■ Section 8(a)(3) of the Act makes it unlawful for an employer "by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1994). An employer that discharges an employee because that employee engaged in union activities thereby violates § 8(a)(3) and (1). *See Teamsters Local 171,* 863 F.2d at 955. In *N.L.R.B. v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), *overruled on other grounds by Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Supreme Court established that the procedure for evaluating an allegation of unlawfully motivated termination is first to require the employee to show that the employer's opposition to protected union activity was a motivating factor in the employer's termination decision, and then to permit the employer to present the affirmative defense that it would have taken the same action had the employee not engaged in protected union activity. *See id.* at 397, 401–03, 103 S.Ct. at 2472, 2474–75; *see*

14. In light of our colleague's assertion that the Board applied the wrong "strand" of *Gissel, see* concurring and dissenting opinion at 1371 (citing *Crown Cork & Seal,* 36 F.3d at 1134), we reiterate that our holding affirms the Board's finding that the newsletter expressed an unlawful "threat of reprisal." *Allegheny Ludlum,* 320 N.L.R.B. at 492 ("An employer violates [the Act] when, during a union organizing campaign, *it threatens employees* by making predictions of adverse economic consequences if the employees designate the Union as their collective-bargaining representative." (emphasis added)). Although in *Crown Cork & Seal* we distinguished two "strands" of threatening statements identified in *Gissel,* we have never held that these two "strands" represent entirely distinct spheres subject to discrete analytical factors, nor would any

such holding comport with the clear language of *Gissel* itself. The Supreme Court in *Gissel* declared that an employer's "prediction as to the precise effects he believes unionization will have on his company" which is not "phrased on the basis of objective fact" violates the Act because it *is* a "threat of retaliation." *Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942. And the Court referred to the "line between" predictions and threats, *id.* at 620, 89 S.Ct. at 1943, further demonstrating that a uniform set of analytical factors is to be applied in evaluating employee communications under the Act—i.e., in determining on which side of the "line" a given set of statements falls. It could hardly be otherwise, since *any* threat could conceivably be characterized as a "prediction" regarding the "precise effect" that a specified action will have.

*also Southwire Co. v. N.L.R.B.*, 820 F.2d 453, 459 (D.C.Cir.1987).

■ The ALJ found that the Company's termination of James Borgan violated § 8(a)(3) and (1) of the Act because it was motivated by Borgan's extensive union activity, and because the employer could not make a credible showing that it would have fired Borgan regardless of his union activities; the Board affirmed this finding. *See Allegheny Ludlum*, 320 N.L.R.B. at 484, 506–07. This finding is amply supported in the record, which includes evidence that the Company departed from its established evaluation procedures to manufacture pretextual, approaching the bizarre, reasons to fire Borgan. The Company, on the other hand, cited no compelling evidence that Borgan had given the Company reason to fire him aside from his union activity; Borgan had received an overall evaluation of "Met Expectations" for each of the three years prior to his discharge. Given Borgan's outspoken and aggressive support for the Union, the fact that this behavior set him apart from most of his fellow salaried employees, and the generally implausible, defensive, and self-contradictory nature of the testimony offered by the Company's witnesses, the inference that his union activity motivated his termination is entirely reasonable.

For the foregoing reasons, the Company's petition for review is *denied* and the Board's cross-application for enforcement of its order is *granted* except as to the portion of the order dealing with the Company's "polling" of its employees related to the preparation of an anti-union videotape; we set aside the "polling" portion of the order, and *remand* it to the Board for a more comprehensible articulation of the relationship between the employer's § 8(c) free speech rights, the requests of consent for employee videotaping, and the procedures that must be followed by employers in obtaining employee consent to such filming.

*So ordered.*

**KAREN LECRAFT HENDERSON,** Circuit Judge, concurring in part and dissenting in part:

Today we vacate a finding of the National Labor Relations Board (Board) that Alleghe-ny Ludlum (AL or Company) violated the National Labor Relations Act (Act) by conducting an unlawful "poll" in its attempt to include only consenting employees in a pro-company videotape. We reach this conclusion because the Board failed to accord weight to AL's speech rights under section 8(c) of the Act. Running throughout our analysis of AL's videotape is the recognition that neither employees' organizational rights under section 7 of the Act nor an employer's speech rights under section 8(c) of the Act operate to the complete exclusion of the other. Although the two rights may often conflict, we must give equal respect to both. Accordingly, we have instructed the Board on remand to articulate criteria that will strike a fair balance between employee and employer rights. I am in full agreement with my colleagues on the decision to remand and concur in that portion of the opinion.

Unfortunately, my colleagues' sensitivity to the need to balance the competing rights of the employer and its employees is missing from their analysis of AL's newsletter *Your Choice, Edition # 2* (*Your Choice*) and for that reason I do not join that portion of the opinion. The Supreme Court has stated, "Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). The *Gissel* Court's mandate to engage in a contextual inquiry springs from the belief that employees, because of their economic dependency on their employer, may ascribe a different meaning to employer speech from those with a "more disinterested ear." *Id.* Thus the Court worried that ignoring the context of the labor relations setting could result in giving too little weight to employee rights. *Gissel's* instruction to consider context, however, is equally necessary to give the employer a fair shake. *Cf. Dow Chem. Co. v. NLRB*, 660 F.2d 637, 644 (5th Cir.1981) ("In analyzing election campaign statements of employers for the presence of promises . . . . [i]t is not sufficient that bits and pieces of statements may be later lifted

out of context, that the facts and circumstances in which the statements were made and which were known to the employee or employees may be ignored, and that those bits and pieces may then be viewed in vacuo . . . .") (citation omitted).

The majority fails to consider the statements in *Your Choice* in context. It first neglects to mention that AL's newsletter was published in response to a Union newsletter, *The A–L Organizer*, which came out several months earlier. Indeed, in response to the question, "How did you develop the specific format for the newsletters?" Joyce Kurcina, AL's Director of Employee Relations, stated, "[W]e got the idea . . . from two sources. One is because the Steel Workers had put out newsletters—the A.L. Organizer. . . . Frankly, they were very effective." DA 182a–183a. In its newsletter, the Union described job security as an important issue in the organizational campaign. The newsletter included several statements from employees that the Union could deliver job security then lacking at AL. For example, one employee stated, "Being organized would bring more security and dignity to our present jobs and provide us with a better pension that will enable us to look forward to retirement." DA 324a. Another employee stated, "We need a Union to get decent raises, job security and better pension benefits." DA 325a. A third employee stated, "I think we need more protection for job security. I give all I can on my job and I think we should get something back." DA 328a. Thus it was the Union that made job security a rallying point in the organizational campaign and its newsletter urged employees that the Union, not AL, was the better provider.

In response to the Union's thrust, the Company parried with *Your Choice*. The lead article entitled "Security for Your Future," opened as follows:

> Salaried employees at Allegheny Ludlum can feel quite secure in their jobs—and with very good reason. Since 1980, the year when Allegheny Ludlum became an

independent company, there have been no layoffs in the salaried ranks . . . repeat: NO LAYOFFS OF SALARIED EMPLOYEES.

> This was in spite of poor business conditions that were forcing other companies to lay off their employees by the hundreds. This was in spite of our own work force reductions in Westwood and Wallingford. This was in spite of the closing of Laminations. This was in spite of a program to return to our 1985 head count level. This was in spite of a 10–week USWA strike last spring.

DA 381a. Following the statements describing AL's record of ensuring job security for salaried employees, the article continued, "In all of these cases the Company found ways to manage the situation without resorting to layoffs of salaried employees." *Id.*

The majority characterizes this final statement as an "ominous" reference to AL's past performance in which the "message was clear" that the Company "would not look so hard [for ways to avoid layoffs] in the future if the Union won." Maj. Op. at 1364. There is, however, not a single word in the article about what AL might do in the future. Like my colleagues, I find that AL's statement sent a clear (but different) message—the salaried non-exempt employees of AL already had job security.

Because the majority reads into the statement an implied threat unsupported by its language (even accepting that the statement was not heard by a "disinterested ear"), the majority's treatment of the newsletter cannot be reconciled with the employer's speech rights protected under section 8(c) of the Act. On the majority's approach it appears that the employer can *never* respond to a union characterization, whether accurate or not, of workplace conditions with a defense of the employer's record.[1] If the employer does respond by describing how it has treated its employees in the past, we will view this as an implied threat to end favorable treatment of

---

1. Although the majority claims that it does not rely upon any parts of the newsletter in which AL defended its past record on job security, Maj. Op. at 1365 n.13, it plainly finds fault with the newsletter's "ominous reference to the Company's past attempts to keep salaried employees' jobs intact." *Id.* at 1364; *see also id.* at 1364 (one of three elements supporting violation of Act is newsletter "statement that salaried employees had retained their jobs in the past").

employees if they vote for unionization and will impose, in effect, a gag rule to prevent the employer from defending its record. This is not how section 8(c) speech rights are to be protected. *Cf. Dow Chem.*, 660 F.2d at 644 ("[C]entral to an analysis of employer statements is the principle that § 8(c) at an irreducible minimum protects the right of an employer to ... make truthful statements of existing facts. The First Amendment would permit no less."); *NLRB v. Automotive Controls Corp.*, 406 F.2d 221, 224 (10th Cir.1969) (concluding that employer's statement that it could move its plant at any time, when union had previously stated that employer would violate law by moving its plant if union won election, was protected under section 8(c) and declaring, "[I]t is necessary to guard against the Board adopting an overly restrictive attitude toward employer communications."); *NLRB v. River Togs, Inc.*, 382 F.2d 198, 202 (2d Cir.1967) ("If § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress' word of promise to the ear but break it to the hope.").

The majority uses two other items in *Your Choice* to support its conclusion. They also are taken out of context. Karen Gallagher's full statement printed in interview format is, "As a salaried employee, I feel I have job security because if it came to a layoff due to lack of work, the first people to be laid off would be those in the union." The majority quotes only the second half of the statement. When the complete sentence is considered, however, it plainly states an individual employee's belief that she *currently* has job security and therefore has no desire to join a union.[2] It is not a threat *by AL* that AL will lay off employees who support the Union. Moreover, her statement follows a lead-in paragraph indicating that Gallagher's views

came "from her experience as a member of the union," DA 319a, while working for a previous employer. A fair reading of the statement, then, is that Gallagher was stating only what her previous employer had done— it had laid off union members first. This reading is corroborated by Gallagher's testimony that her newsletter comments referred to her "past experiences of being laid off" and not "the bargaining unit that was going to vote." DA 179a. And finally the newsletter cartoon. It depicts a rat on a leash held by a hand labelled with the Union's initials. The rat is removing a blanket from a sleeping figure. The blanket has AL's initials on it and is labelled, "Secure Job at AL." The caption asks, "Will they get AL's security blanket?" DA 322a. I read the cartoon as a statement, albeit a blunt one, that AL employees currently enjoy job security. The rat symbolizes AL's belief that the Union will do a poorer job of providing job security than AL. All three newsletter items highlighted by the majority do no more than give AL's view of the current status of job security in response to the Union's version.[3]

An employer must be permitted to answer union charges if its speech rights under section 8(c) have any meaning. Even if AL had not been responding to the Union's claims about job security, I would nevertheless find that AL's newsletter does not run afoul of the Act. *Gissel* sets forth the rule governing AL's newsletter:

[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case,

---

**2.** In any event Gallagher's statements should not form the basis to affirm the Board's finding that *Your Choice* violated the Act. Gallagher's interview was excerpted from AL's promotional video. At oral argument Board counsel stated, "The Board does not say that the videotape itself is a violation of the Act." Having conceded that, it cannot also argue that the same statements violate the Act if included in a newsletter.

**3.** The majority emphasizes that the *combination* of the three items, each "reinforcing" the others, constituted a threat, Maj. Op. at 1364–65, 1366, and at the same time characterizes a particularized analysis of the items as non-contextual. *Id.* at 1364–65. Frankly, I fail to see how the newsletter can be evaluated except by reviewing its contents. In any event, three items, none of which threatens reprisal, cannot together do otherwise.

however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization.

395 U.S. at 618, 89 S.Ct. at 1942. In *Crown Cork & Seal Co. v. NLRB,* 36 F.3d 1130 (D.C.Cir.1994), we described, and distinguished, two different "strands" under *Gissel.* 36 F.3d at 1134. Under the first strand, the Board "may condemn a 'threat of reprisal.'" *Id.* Under the second strand, the Board "may sanction at least some predictions of adverse economic consequences: predictions that may be understood by workers, as threats, because they *suggest* that the action will occur not because of ordinary operations of a market economy ('economic necessities'), but because the employer, for reasons of labor strategy, will seek to penalize concerted activity." *Id.* (emphasis in original).

Notwithstanding the majority's contrary characterization, Maj. Op. at 1367 n.14, the Board mistakenly analyzed this case under the second strand of *Gissel. See Allegheny Ludlum Corp.,* 320 N.L.R.B. 484, 492, 1995 WL 798342 (1995) (quoting portion of *Gissel* standard referring to "demonstrably probable consequences beyond [employer's] control" but making no mention of *Gissel's* "threat of reprisal" language). The second strand of *Gissel,* however, applies to an employer who makes predictions of *"precise effects* he believes unionization will have on his company." *Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942 (emphasis added). *Your Choice* simply outlines AL's job security history and its belief that it will do a better job of continuing job security than the Union. I fail to see how these statements can be read as a prediction of "precise effects." To analyze this case under the second strand of *Gissel* establishes a standard that will be impossible for any employer to meet. Because AL made no prediction of "precise effects" to begin with, there are no objective facts to which it can point to show that its "prediction" describes consequences beyond its control.

By contrast, *Crown Cork* and *Somerset Welding & Steel v. NLRB,* 987 F.2d 777 (D.C.Cir.1993), are properly analyzed under the second strand of *Gissel.* Thus I agree with the majority that *Crown Cork* and *Somerset Welding* are distinguishable in that the employers' statements in those cases were based on objective facts not within their control. *Crown Cork* involved a multi-plant bargaining unit with a master collective bargaining agreement. With the operative contract terms before it, the employer had a factual basis for its predictions. Similarly in *Somerset Welding* the employer's predictions were based on a financial report that it showed to the employees. There is no comparable item of objective fact here. The majority, however, looks at only one half of the story because AL did not predict "precise effects" as did the employers in *Crown Cork* and *Somerset Welding.* In *Crown Cork* the employer stated, "WE WILL NOT BRING WORK INTO THIS PLANT." 36 F.3d at 1133. In *Somerset Welding* the employer stated, "there'd be no way that the shop could continue to go." 987 F.2d at 780. Under *Gissel* these predictions of precise effects must be based on objective fact. No such requirement applies to the statements in AL's newsletter. Because I believe that AL's newsletter does not violate the Act, I respectfully dissent from Part II.B of the majority opinion.